12 F.Supp. 913 (1935)
THE MUNAIRES.
ANTHONY GIBBS & CO.
v.
MUNSON S. S. LINE, and six other cases.
Nos. 94, 20440, 20434, 20437, 20582, 20438, 20643, and 20645.
District Court, E. D. Louisiana.
December 12, 1935.
Bigham, Englar, Jones & Houston, of New York City, Rosen, Kammer, Wolff & Farrar, of New Orleans, La., Henry N. Longley, of New York City, Edwin C. Hollins, of New Orleans, La., and P. J. Kooiman, of New York City, for libelants, claimants, and claimants-exceptors.
Kirlin, Campbell, Hickox, Keating & McGrann, of New York City, Terriberry, Young, Rault & Carroll, of New Orleans, La., Cletus Keating, of New York City, Joseph M. Rault and Walter Carroll, both of New Orleans, La., and James H. Herbert, of New York City, for respondents and petitioners.
BORAH, District Judge.
On March 11, 1930, shortly before the hour of 3:29 p. m., a fire broke out on the Mandeville street wharf in the harbor of New Orleans and rapidly communicated itself to the steamship Munaires, which was then tied up to the dock. As a result of the fire, the wharf and the various shipments of cargo thereon were destroyed, the steamship was damaged, and the cargo laden thereon either damaged or destroyed. These proceedings are the outgrowth of this catastrophe and concern the damage to and destruction of merchandise resulting from the fire.
The owners of the merchandise on the wharf which was destroyed are libelants in suits filed against the respondent Munson Steamship Line. The Munson Steamship Line and the Munaires Steamship Corporation, as owners and/or chartered owners of the steamship Munaires, hereafter for convenience called the respondents, are petitioners in a proceeding seeking exoneration from, or limitation of, liability arising out of the loss or damage to cargo loaded on the steamship Munaires or which was on the dock, having been received for shipment on said vessel but not yet having been loaded thereon. The owners of the cargo laden on the Munaires are claimants in the limitation proceeding; and the owners of certain merchandise *914 which was damaged or destroyed while on the wharf awaiting shipment are claimants appearing specially in the limitation proceeding who have excepted to that proceeding, so far as it concerns their interest, on the ground that their in rem rights cannot effectively be destroyed by the filing of the petition for limitation of liability.
All of the above-mentioned proceedings were tried together, and it has been stipulated that the merchandise involved in all the cases was delivered to the respondent in apparent good order and condition and that it sustained some damage subsequently. It has been further stipulated that in one or more cases a cargo owner having proper legal status as alleged in the pleadings, and who had complied with the notice of claim in time for suit clauses, was before the court; furthermore, it is conceded that the respondent was engaged in the common carriage of the merchandise in question.
It therefore may be said that the stipulations, plus the allegations of the petition and the admissions and allegations in the respective answers, establish prima facie the respondents' liability to the cargo owners.
The respondents have pleaded by way of defense the Fire Statute and assert that the language of the exemption in the bill of lading relieves them of all liability. On the other hand, the cargo owners claim that the respondents were negligent in the particulars hereinafter considered, and it is around these issues that the principal argument in this case is centered.
At the time of the fire the Mandeville street wharf was owned by the state of Louisiana and was under the immediate jurisdiction of the Board of Commissioners for the Port of New Orleans, hereinafter called the Dock Board. However, for more than two years prior thereto the respondents had had "first call on berth privilege" for the entire Mandeville street wharf, and though the Dock Board could have employed the wharf in berthing any ship it wished, only one vessel not owned or controlled by the respondent had ever berthed there.
The wharf ran parallel and alongside the river bank and was approximately 1,085 feet long and 145 feet wide. Along the shore side of the wharf between the freight shed and the railroad tracks and on the retaining wall was a 30-foot concrete driveway which was open to the public. This driveway, adjacent to the wharf and the flooring of the shed, was separated by an expansion joint approximately one inch wide on either edge of which was a steel band, and this opening extended the whole length of the wharf although from section 1 to section 34½ the side of the opening towards the river was formed by cement slabs, while below section 34½ it was formed by the wooden flooring of the wharf. The wooden flooring consisted of eight-inch planks laid closely together, on top of which was a one-inch planking running diagonally across the subfloor, thus making a water-tight surface. The flooring rested on pilings and stringers which were made of creosoted timber. The covered portion of the wharf consisted of fifty-three sections each 20 feet in width and extending in length from the edge of the concrete roadway to the outer apron, a distance of 120 feet; section 1 being at the upstream end and section 53 at the downstream end of the wharf. Under the wharf, in the river, approximately 50 feet from the inland side where the wharf meets the concrete retaining wall, was a wooden bulkhead consisting of three thicknesses of tongue and groove sheeting, thus effectively preventing anything floating from the water side of the dock to the shore.
Respondent maintained two offices on the wharf, one a raised construction 10 or 11 feet above the flooring at section 24, and a small office about 8 feet by 12 feet located on the floor of the dock just inside of the doorway and slightly upstream from section 39. This small office, which is sometimes referred to in the testimony as the "South American Office," was located with its rear against the freight shed wall, with its door towards the river, and from its window facing downstream it was about 12 to 14 feet from the point where the smoke was first seen coming out of the expansion joint in the doorway at section 39.
The wharf was of standard construction for the harbor of New Orleans, was at the time regarded by the Dock Board engineers as safe with respect to fires, and was regularly inspected and approved by fire underwriters. Water hose connections and 50-foot lengths of hose in racks were placed at frequent intervals on the dock, and fire barrels filled with *915 water with buckets were located at different places. Fire extinguishers were located in a hose house and adequate fire alarm apparatus was provided, all of which equipment was maintained and regularly inspected by the Dock Board authorities. The Munson Line also had a day and night watchman stationed on the wharf, and the Dock Board maintained a patrolman thereon at all times, and employed other officers who made daily inspections.
The maintenance of the wharf was solely in the hands of the Dock Board, though the user thereof was required to keep the inside of the covered shed clean. The concrete roadway, including the expansion joint which separated it from the wharf and the aprons on the water side, were not only maintained but cleaned as well by the Dock Board. The land and water beneath the pier were under the exclusive jurisdiction of the Dock Board, and as a matter of fact the only part of the premises over which the Munson Line had any jurisdiction whatsoever was the covered shed inside the expansion joint.
The evidence definitely establishes the fact that the fire alarm was turned in at 3:29 p. m. on the day in question; that the first engine arrived on the scene approximately three minutes thereafter. Two of the libelants' witnesses claimed to have discovered the fire, though neither one saw the other, and their stories are somewhat in conflict. Crow says that while standing across the railroad tracks from the wharf lighting his cigarette, he saw out of the corner of his eye a flash inside one of the doorways and gathered the impression that he had witnessed some electric welding. That he continued his vigilance until such time as it would take to consume a cigarette, then walked over to the doorway at section 39, but did not see anything in particular. However, upon looking down through the expansion joint heretofore described, he saw only a little glow of embers, and while still looking he witnessed a little puff of smoke and flame come up through the aperture. Whereupon he shouted to a group of workmen whose identity has not been established that the dock was on fire, but as there were no visible indications of fire they paid, according to his story, no attention. Thereupon the witness says that he went up to one of the men working on the dock and said, "Listen, your dock is on fire"; whereupon he brought this unidentified individual over to the expansion joint and pointed to the glow of embers. Thereupon two white men and several negroes got out a hose and started putting water down the aperture. According to Crow's estimate, fifteen to twenty minutes elapsed from the time he first looked down the expansion joint and saw the puff of smoke until the fire apparatus arrived, and that "more than five and less than twelve minutes elapsed from the time he heard some unknown person say he would turn in an alarm."
Carpenter Smith says that while in the South American office, which was the small office heretofore described, he looked through the window and saw smoke coming through the expansion joint at section 39; whereupon he ran out and called respondents' two receiving clerks and told them that there was a fire outside under the wharf. Smith also claims that he called to Sims, a negro, to get a hose from the locker of the Dock Board and spray the fire; and that he thereupon went back to his work further down the pier without giving the matter further attention, as he did not regard the situation as serious. In the meantime, Vinet, the Dock Board patrolman, and Delle, the Munson Line chief clerk, who were in the main office, had received notice of the fire. They at once ran to section 39, verified the fact that there was a fire, and immediately ran back and Vinet turned in the alarm.
Captain Sanders, in charge of Engine No. 9 which was only five blocks away, arrived at the scene of the fire with the first unit of fire equipment within two or three minutes after receiving the alarm. When he arrived puffs of smoke were in evidence at different places, but it was not long before the fire spread with great rapidity.
Armbruster, in command of Hook and Ladder No. 3, arrived next within five minutes after receiving the alarm. Upon arriving he went to the river's edge and found the lower edge of the wharf all afire. The fire increased rapidly and a general alarm was sent in at 3:37 p. m.
It further appears that at the time Vinet and Delle were informed of the fire and ran up to section 39 and saw the smoke coming from the expansion *916 joint, they gave orders to the foreman of stevedores to turn the Munaires loose. While Delle did not personally see that this order was carried out, it is definitely established by the testimony of Scott, a water boy of the Munaires who was then aboard ship, and by the officers of the ship, that the foreman of the stevedores shouted that the dock was on fire, and that the stevedores quickly left the ship, and the ship's officers immediately began the difficult operation of getting the ship away from the dock without the aid of tugs.
Duplessis, a witness for the libelants, stated that the first knowledge he had of the fire was the warning which he heard shouted to the ship.
The evidence further shows that the ship's crew with the aid of assistance from shore eventually got the lines loose and the stern of the vessel drifted away from the dock, but the current held the bow into the pier, and that the fire, accompanied by dense clouds of smoke, spread so rapidly that the ship took fire before the assistance of tugs could be procured to tow the vessel away.
Libelants contend that the merchandise on the wharf and on the Munaires was subjected to extraordinary danger and destruction by fire; that the wharf was so constructed as to present a serious fire hazard; that the hazard was increased by virtue of the fact that respondents permitted a collection of debris on the shore under the wharf, a considerable portion of which was there as the result of violation of Dock Board orders; that in further disregard of Dock Board regulations and in violation of an ordinance of the city of New Orleans, respondents' employees habitually smoked on the wharf, on the roadway, and on ships tied up at the wharf; that gasoline and kerosene were stored on the wharf contrary to law; that the fire fighting equipment on the dock was inadequate; that respondents were negligent in that they had not established any adequate system of guarding against the outbreak of fire or covering the steps that should be taken in case of fire; that there was an extraordinary negligent delay in turning in the alarm of fire and in advising the officers of the Munaires of the existence thereof; and concluded that the fire not only resulted from the respondents' negligence, but that its discovery was delayed and no adequate steps were taken to extinguish it by reason of respondents' continued negligence.
The evidence shows that there were between seventy-five and one hundred people on the wharf on the day of the fire and that there is considerable traffic along the concrete highway both on foot and in motorcars, and that on occasions those passing along the highway had to be cautioned against smoking. Truckmen employed by the cargo owners were constantly crossing the expansion joint in entering and leaving section 39, and railroad employees were at work in cars alongside the concrete highway in that vicinity. Persons other than respondents' employees also frequented the underneath portion of the dock.
A lighted cigarette in the hands of an imprudent smoker may have been carelessly discarded in or in the way of the aperture and fanned therein by the breeze which was blowing from the land to the river, or again the fire may have been the work of incendiaries or the result of defective wires; the latter possibility to my mind being the most potential, for under such circumstances one would expect to see a blue flame as in electric welding which is the character of flash that Crow describes. The most that can be said is that the record discloses a number of purely speculative suggestions as to the possible causes of the fire. No one knows the exact point of its origin, nor what the material was which first ignited it. All that is known is that somewhere under the dock in the vicinity of section 39 something started to burn from an unknown cause and the smoke simply came out of the nearest opening, there being no expansion joints inside the pier at section 39. The most that can be said is that the fire may have resulted from any one of several causes, for some of which the respondents were responsible and for some of which they were not. That is not enough, as the evidence here does not lead me to believe that the probabilities are that the fire resulted from the respondents' negligence.
Nor have libelants sustained the burden of establishing that the destruction of or damage to their merchandise on the wharf was the result of the respondents' negligence. Assuming that the fire alarm was not turned in as promptly as *917 possible, there still remains the question as to whether or not the fire department could have prevented the burning of the pier if they had arrived at the very moment that the fire was discovered. As far as I am aware, no witness has intimated that there was any time to remove the cargo from the dock after the fire started. No one saw the fire start, and no one knows when or the exact location where it started, or in fact knows anything of its character or extent. However, it is definitely known that the fire spread with great rapidity and that fires under a wharf are very difficult to combat. Considering the known and unknown facts, it would seem to be the purest sort of speculation to say that the merchandise on the wharf would have been saved had not respondents delayed turning in the alarm, a delay which according to estimates that are notoriously known to be inaccurate could not have been more than a question of minutes. In this same connection it has been stipulated that all of the damage to the merchandise on the wharf resulted from the fire, and in view of the decision of the Circuit Court of Appeals for this circuit in Luckenbach S. S. Co. v. American Mills Co., 24 F.(2d) 704, 1928 A.M.C. 558, it has been further stipulated that the merchandise on the wharf was subject to the terms and conditions of the regular forms of Munson Line bills of lading which contain the following clause: "11. The Carrier shall not be liable, as carrier or otherwise, for any loss, damage, delay or default whether occurring during the transit or before, or after, or during, or while awaiting loading, transshipment, discharge, delivery or other disposition of the Goods, or on board or in lighters or craft, or on wharf or in warehouse, at any port or place, occasioned by any of the following Excepted Clauses, throughout this Contract always excepted: * * *; by fire or explosion from any cause whatsoever occurring. * * *"
The national public policy regarding shipowner's liability for fires is expressed in the Fire Statute, 46 U.S.C.A. § 182. This statute by its terms relieves a shipowner from liability for fires occurring on shipboard, unless caused by his design or neglect. While it does not in express terms relieve a shipowner of liability for fires occurring to cargo on a dock, it does nevertheless permit a shipowner to contract for an exemption for fire damaging cargo on a dock on as broad a basis as that afforded him in respect of fires occurring on shipboard. From the language of the exemption in the bill of lading above quoted the shipowner is clearly not liable for any fire occurring without the owner's personal design or neglect, and consequently fully relieves the respondents here. But even if there was any negligence and that negligence prevented the cargo on the dock from being saved, it must from the very nature of things have been the negligence of the respondents' clerks, as its general manager and wharf superintendent were not on the dock at the time of the fire. The negligence of such persons is not the negligence of the shipowner and the shipowner is entitled to the benefit of the Fire Statute or bill of lading exemption, as the case may be. Earle & Stoddart v. Ellerman's Wilson Line (The Galileo) 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403; Constable v. National S. S. Co., 154 U.S. 51, 62, 14 S.Ct. 1062, 38 L.Ed. 903.
The only remaining issue covered by the pleading that need be considered is libelants' charge that respondents were negligent in connection with the damage or loss of the cargo on board the Munaires, in that the Munaries was not taken from the pier as quickly as possible after the fire was discovered. At and immediately preceding the time of the fire, the Munaires was tied up at the wharf with her forward well deck about opposite section 39 on the wharf. She had a deck load of pine lumber, her five hatches were all open, and longshoremen were loading cargo, and some of the ship's crew were over the ship's side chipping and painting. At that time there were seventy-five or one hundred people on the wharf. Scott, a witness for the respondents whose testimony was taken in open court and whose apparent candor I noted at the trial, stated that he was on the ship at the time the foreman shouted there was a fire, and that the ship's whistle blew when he got on the apron of the wharf. Scott says that he saw smoke coming up between the crack, and water from a hose line going towards the smoke, and it was some time thereafter, after he had traversed the wharf and lifted the curtains, that some one hollered the firemen are coming. Considering this testimony in the *918 light of the undisputed fact that the first unit of fire fighting equipment arrived on the scene within two or three minutes after the alarm was turned in, the conclusion is warranted that the ship's officers were apprised of the fire at about the time respondents claim they were notified. That being true, the present issue involves practically the same proposition that was considered in discussing the damage to the merchandise on the wharf. It will serve no useful purpose to repeat again what was said in that connection. Sufficient be it to say that in my judgment the entire matter rests in the realm of speculation and that it is not possible to say with any degree of certainty that if the vessel had been notified of the fire a few moments earlier she could have in the emergency freed her lines and got away from the dock without damage to her cargo. In a case such as this where the fire starts on a pier and is communicated to cargo on a ship, the Fire Statute is applicable and, accordingly, the respondents are entitled to complete immunity. Providence & N. Y. S. S. Co. v. Hill Mfg. Co., 109 U.S. 578, 3 S.Ct. 379, 617, 27 L.Ed. 1038. The Etna Maru (C.C.A.) 33 F.(2d) 232, upon which libelants rely, can have no application, as that proceeding involved a libel in rem and the proceedings here are limitation of liability proceedings in which exoneration is allowable under the Fire Statute. The Salvore (C.C.A.) 60 F.(2d) 683, 685. Furthermore, the language in the opinion upon which libelants rely, namely, that the Fire Statute (46 U.S.C.A. § 182) and the Limitation of Liability Statute (46 U.S.C.A. § 183 et seq.) are in pari materia, is not binding on this court in view of the decision of the Supreme Court in Earle & Stoddart, Inc., v. Ellerman's Wilson Line (The Galileo) 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403. As previously indicated, all of the bills of lading contained an express contract making the Fire Statute a defense, and as was held in The Queen of the Pacific, 180 U.S. 49, 21 S.Ct. 278, 45 L.Ed. 419, such a contract is available not only to the shipowner but to the ship in rem, and this is a further reason why The Etna Maru has no application.
A decree may accordingly be entered dismissing all the libels with costs, and granting unto petitioners the relief prayed for.