## THE ELLENOR.

### No. 27.

District Court, S. D. of Florida, Tampa Division.

May 26, 1941.

Hampton, Bull & Crom, of Tampa, Fla., for libelant.

Cody Fowler and William A. Gillen, both of Tampa, Fla., for claimant, A. H. Bull S. S. Co.

WALLER, District Judge.

The stipulation filed covers the greater portion of the facts in this case, but in brief the facts may be summarized as follows:

The Steamship Ellenor entered into a charter party with Ashcraft-Wilkinson Company to carry a cargo of castor pomace in bags from Edgewater, New Jersey, to Tampa, Florida. The loading and unloading of the cargo was done by stevedoring concerns under contract with the shipper, the vessel being in no wise charged with or concerned with the loading or unloading of said vessel. It was simply to transport the cargo from Edgewater, New Jersey, to Tampa, Florida. Blocks Terminal, Inc., a stevedoring company in Tampa, Florida, of long experience in the handling of cargoes of castor pomace, was employed by the shipper to unload said cargo. The master of the vessel had no right to direct the stevedoring company or its employees in the unloading of the cargo.

Castor pomace is the residue of the castor bean after castor oil and other products have been extracted and is used in the manufacture of fertilizer because of its rather high ammonia content. The pomace is ground up and has only from ten to twelve per cent of moisture content; that is to say, it is normally a dry substance, but being vegetable matter it is, of course, subject to decomposition when wet and heated, and under conditions of heat, dampness, and attendant decomposition, gives

off, as do other vegetable matters under similar circumstances, carbon dioxide.

The testimony shows without dispute that there has never been a known injury to any person from the handling of castor pomace. It was conclusively shown by the chemists of the two main manufacturers in the United States that castor pomace has always heretofore been regarded as an entirely harmless substance. It was likewise shown by all the witnesses who testified, including several stevedores experienced in the long handling of castor pomace, that no instance had ever been known or heard of wherein any person had ever been harmed in the handling of castor pomace, either loading, unloading, or otherwise, and that no precautions whatsoever were ever taken, either by the manufacturer, who stored the pomace and who then loaded same for shipment, or by stevedores who unloaded same from the vessel. One stevedore showed that seventy-three cargoes carried in vessels had been unloaded by his company in Tampa since 1937, and that William Freeman, the deceased, had assisted in unloading twenty-four of those vessels, and at no time had anyone ever been injured and at no time had any precautions whatsoever been taken as would have been the case had the cargo been considered a dangerous commodity.

Nevertheless, on the 19th of June, 1940, William Freeman, husband of the libelant, together with other longshoremen employed by Blocks Terminal, Inc., a stevedoring company, which was under contract to unload the vessel, went on board the steamship; that William Freeman and a fellow servant, Roosevelt Mack, after removing the hatch cover on hold No. 2, descended into said hold; that shortly both the said Freeman and the said Mack were overcome, became unconscious, and collapsed in said hold. One of the foremen of the stevedoring company also descended into the hold and was partially overcome. The foreman and Roosevelt Mack were rescued from said hold and recovered. However, William Freeman died shortly after being taken from the hold. There was testimony that some of the bags of pomace in said hold were damp, or wet, on the top immediately under or in the vicinity of the hatch on hold No. 2. There was testimony that the hold had "sweated" and that the condensation had dripped from around the hatch covering on some of the bags immediately beneath the hatch. Other witnesses denied that any of the bags were damp or wet. Between two and three hours after the death of William Freeman a chemist took samples and made tests of the air in the hold of said vessel and found three-tenths of one per cent carbon dioxide present, which is in excess of the normal amount of carbon dioxide that should be present in normal air. The testimony does not reveal whether or not the hatch cover was left open during this period of two or three hours, and it is argued by the libelant that the air had considerably purified itself within said period even though carbon dioxide is approximately one and one-half times heavier than air. One chemist testified that the fact that the air in the hold was hot would cause a current to set in, which upward current would carry with it much of the carbon dioxide even though it were heavier than air. Testimony also showed that the ship's ventilator over hold No. 2 was closed. No allegation of negligence based upon this fact is contained in the libel.

From the above facts the Court is led to the conclusion that William Freeman came to his death from asphyxiation from carbon dioxide gas in the hold of said vessel. In the absence of any other explanation or source from which said gas could have come the Court is obliged to conclude that the carbon dioxide gas was generated from the cargo of castor pomace in said hold No. 2. An attending physician gave as the cause of the death of William Freeman asphyxiation from fumes of carbon dioxide. Two other persons were also partially overcome in said hold.

Having reached the conclusion that William Freeman came to his death from carbon dioxide poisoning generated by said cargo, in said hold of said vessel, it is now necessary to determine whether or not the vessel is liable in damages for the death of the said William Freeman so occurring. The libel charges that the vessel was negligent in the following particulars:

"(a) By the failure to inspect said vessel and determine the existence or presence of deadly fumes or gases within the hold of the same.

"(b) Said steamship, her master, owners or charterers were guilty of negligence in directing or inviting said William Freeman to enter the hold of said vessel without making sure that said premises were reasonably safe.

"(c) That said steamship, the owners, master and charterers of the same, improperly directed the said William Freeman to work in an unreasonable, defective and dangerous place, where he was exposed to the danger of escaping fumes or gases by reason of the character of the cargo, all of which was known to those in charge of said vessel, or could have been known by the exercise of reasonable care, but were unknown to said William Freeman.

"(d) In that the said vessel, its master, owners or charterers, failed to provide the said William Freeman with a safe place to work."

Specifications of negligence (a), (b), and (d), above quoted, may be grouped together for disposition. Specification of negligence (c) will be disregarded for the reason that there is no testimony that the steamship, its owners, or master, directed the said William Freeman in any respect. There is no proof that the master of the vessel knew the danger of escaping fumes or gases, or that this danger was unknown to the said William Freeman. There is no testimony in the record that the vessel had ever before transported a cargo of castor pomace. There is no testimony that the master of the vessel had any knowledge of castor pomace or any experience in handling same. On the other hand, the testimony shows that William Freeman, the deceased, had been for many years a stevedore and that he was thoroughly familiar with unloading castor pomace and had assisted in unloading many cargoes of said commodity, while the evidence is wholly silent as to any knowledge of said commodity on the part of the master or members of the crew of said vessel.

█ Specifications (a), (b), and (d) all relate to an alleged failure of the vessel to inspect and determine the existence of gas fumes, and that in the absence of such precaution the vessel had failed to furnish the deceased with a safe place to work. In its last analysis the only ground of negligence alleged that presents any difficulty is the allegation that the master of the vessel should have inspected the hold to determine whether or not it contained gases and, therefore, was dangerous for human entry. The safe place to work rule is subject to the limitation that the master is not required to eliminate all the danger attendant upon work that is inherently dangerous. For instance, if the vessel had contained a cargo of gunpowder, the danger of which was known to the longshoremen, the master of the vessel could not, and would not be required to, eliminate the hazards that are inherent in its handling. Neither is the master required to warn an experienced servant of dangers with which the servant is thoroughly familiar. Particularly is that true in this case, because the evidence shows that the deceased was thoroughly familiar with castor pomace, while there is no evidence whatsoever that the master of the vessel had any familiarity therewith.

We are not, however, here dealing with a commodity that was known to be dangerous, such as gunpowder. On the contrary, the evidence conclusively shows that castor pomace had never theretofore been considered as dangerous and that there is apparently no record of any injury theretofore having arisen from gases generated by castor pomace.

█ It is axiomatic that one is expected to guard against only such dangers as a reasonably prudent person would be reasonably expected to anticipate. Clairvoyance is not requisite. It would seem that if those experienced in manufacturing, loading, and unloading castor pomace throughout the years had never been able to recognize any danger from said commodity it would hardly be expected that one unfamiliar with the commodity would be expected to recognize and anticipate any danger therefrom.

█ In the absence of any testimony as to any prior knowledge of any dangerous character of said commodity by those familiar with it, I am compelled to hold that the master of the vessel was not expected to recognize or anticipate any danger from said cargo, and was under no duty of investigating and inspecting for a danger which no one theretofore had experienced under such circumstances.

█ The vessel's only duty in connection with this cargo was to transport it from Edgewater to Tampa. The loading and unloading was a matter trusted entirely, by contract, by the shipper, to other hands. If there was a duty to investigate, it was the duty of the contracting stevedoring company who had sole charge of the manner and method of unloading said cargo and sole charge of its servants so engaged. When the vessel docked at Tampa for unloading, it had fulfilled its entire obligation. If a carload of castor pomace

580

had been loaded into a railroad box car at Edgewater and transported by rail to Tampa where an unloading contractor had sent its experienced employee into the box car for the purpose of unloading the same and said employee had there been asphyxiated, it could never be asserted that the transporting railroad would be liable when it had nothing to do with the loading, the inspection of the cargo, or the unloading of the cargo. The fact that the cargo was brought in a vessel would not seem to change the obligation of the carrier. We do not have a case in which the ladders, decks, and appliances of the vessel were unsafe, but we have a commodity, which the stevedoring company contracted to unload, which now appears to have had dangerous potentialities but which at the time, and theretofore, were wholly unrecognized even by those long experienced in the handling thereof.

■ The furnishing of a safe place to work rule is generally applicable in cases of master and servant or in cases where work is being done on the property, vessel or otherwise, of the owner. In the present case the work being done by the stevedore and its employees was being done not for the vessel but for the shippers.

■ It is argued that the fact that vegetable matter decays and gives off carbon dioxide is a matter of common knowledge; that the master of the vessel should have known this. By the same token William Freeman should have known it because of his long experience in the handling of castor pomace. His employer should have known it. If William Freeman knew these facts, which are supposed to be known of all men, then he would have been guilty of contributory negligence under the Florida Death by Wrongful Act Statute, Comp. Gen.Laws Fla.1927, § 7047, on which this action is predicated, and his widow could not have recovered.

It seems unnecessary to review numerous cases cited by the libelant for the reason that the majority of them dealt with work being done by the employee of the independent contractor on the vessel itself in the nature of repairs to the vessel, over which the master of the vessel had some measure of responsibility and control, but in the present case the work of the deceased was not being done for the ship but at the instance and under the contract of the shipper and over which the master

of the vessel had no control or right of supervision.

From the foregoing it seems clear that the libelant's right to recover is under the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. § 901 et seq., but that there is no liability on the part of the vessel in this action. It follows, therefore, that the libel should be dismissed at the cost of the libelant.

Let an appropriate order be prepared and submitted.