Frank J. ROONEY, Appellant,

v.

Louis NUTA et al., Claimants, Appellees.

No. 17302.

United States Court of Appeals
Fifth Circuit.

June 5, 1959.

Cromwell A. Anderson, Douglas D. Batchelor, Smathers, Thompson & Dyer, Miami, Fla., for appellant.

Ray M. Watson, C. Carey Matthews, Leonard P. Cardone, David Goldman, Miami, Fla., Leonard C. Kessler, Miami, Beach, Fla., Lucille Hellman, Matthews & Quinton, Miami, Fla., for appellees.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

The question presented by this appeal is whether the record contains evidence sufficient to support the finding of the lower court, sitting without jury, that appellant Rooney was not entitled to limitation of liability or to exoneration as prayed for in his petition filed under 46 U.S.C.A. § 181, et seq. Appellant was the owner of the yacht "Ronar", which burned in the early morning of January 16, 1957 while docked at Nuta's Yacht Basin, Miami, Florida, when fire broke out aboard it causing damage, not only to the yacht, but to Nuta's Basin and to certain vessels situated in the vicinity. The trial court entered its findings of fact [1] and concluded that the statutes providing for limitation of liability and exoneration did not apply [2] and entered a final decree for the total sum of $33,220.14 in favor of Louis Nuta, owner of Nuta's Yacht Basin, and eight other

[1]. "3. There was evidence that there had been a fire in the electrical system of the vessel prior to it being placed in dry storage, and there was further evidence that her electrical system had deteriorated. Prior to returning the vessel to the water, an employee of the Miami Shipbuilding Corporation checked its wiring with a volt-meter, but no complete visual inspection was made nor was the wiring checked out from the place of the former short and fire. The Miami Shipbuilding Corporation made various other repairs including the installation of a refrigerator pump and bilge pump, and checking of the engines.

"4. Following the work on the vessel at Miami Shipbuilding Corporation, the vessel was returned to the water, and moved under its own power to Nuta's Yacht Basin, where various employees of Miami Shipbuilding Corporation and others continued repairs. Work was begun to scrape and revarnish parts of the vessel.

"5. Assisting Captain Lancaster was Mr. John Howcroft, a friend of Mr. Rooney's and experienced in the operation and maintainance of small craft. He testified that Mr. Rooney ordered the vessel put in shape. Mr. Rooney, however, did not personally supervise the work on the vessel.

"6. Prior to and after the vessel was docked at Nuta's Yacht Basin, difficulty was experienced in keeping the batteries

charged. For five consecutive nights the batteries became discharged, sufficient to require recharging. There was testimony that this indicated a short circuit somewhere in the electrical system.

\* \* \* \* \*

"8. The evidence shows that the fire began in the salon of the vessel. Although there are many theories as to the cause of the fire, the Court finds that the fire was caused by defective wiring of the vessel."

[2]. "4. Although an inspection was made of the wiring system upon orders of petitioner, petitioner or his agents did not use due diligence to remedy the dangerous condition, as required because of the previous fire and constantly run-down batteries. The owner of a vessel has a nondelegable duty to use due diligence in maintaining his vessel in a seaworthy and safe condition, and further, no limitation or exoneration will be allowed when the individual owner has delegated broad general powers to his personal agent in the supervision and maintenance of a vessel, and such agent fails to exercise due diligence in repairing the vessel.

"5. The petitioner Frank J. Rooney is not entitled to exoneration from liability or limitation of liability in the foregoing case. Claimants herein are entitled to recover those damages as stated in finding number ten."

claimants who owned vessels docked nearby.

Upon the general ground that the findings of the trial court were not supported by sufficient legal evidence to sustain its judgment, appellant appeals praying that we examine the evidence and render judgment in his favor. A careful reading of the evidence and consideration of the applicable law convinces us that the appellant's position is well taken. The facts, as such, are really not in dispute; and under established legal principles we think that, at most, they give rise to speculation and conjecture that the fire upon Rooney's yacht "could" have been caused by his negligence. But they do not justify an inference of the stable and dependable quality necessary to support a conclusion upon which a judgment can be founded.

Appellant had acquired the Ronar early in 1956 and used it for some time, and had put it in dry storage at Miami Shipbuilding Corporation in August, 1956. As found by the court below, in December following, he "ordered the Miami Shipbuilding Corporation to survey the vessel, check its condition, and put the vessel in order, and return it to the water. Captain William Lancaster, an experienced captain, was hired by petitioner as master of the yacht." Rooney did not see the yacht from November 1956 until the time of the fire. He had been advised that, before he purchased the vessel, there had been a short circuit in the wiring.[3]

The general manager of Miami Shipbuilding Corporation testified along with several of its employees. There is no real dispute between appellant and them as to appellant's statement that he, being a building contractor and not well versed in the care and maintenance of boats, had instructed Miami, a reputable concern which built and repaired vessels, to do everything necessary to put the Ronar in proper and safe condition. The bill rendered by Miami to Rooney and paid by him reduced to specific terms what was ordered and what was done in connection with the electrical wiring.[4]

After Miami had completed most of the work the vessel was returned to the water and moved under its own power to Nuta's Yacht Basin so that the captain could have it under cover to do some painting. While it was there, Miami sent several of its employees to complete the repairs it had been ordered to make.

The court below based its holding of negligence on appellant's part on the previous "fire in the electrical system" and upon the difficulty which was experienced in keeping the batteries charged. The court stated that, "There was testimony that this indicated a short circuit somewhere in the electrical system." Based upon these findings it concluded that the fire began in the salon of the vessel and "Although there are many theories as to the cause of the fire, the court finds that the fire was caused by defective wiring of the vessel. [And that] The petitioner and his agent,

3. "Q. Mr. Rooney, did you know that there had been a previous fire aboard the Ronar?

"A. A previous captain told me he was in Nassau and that he had a short—as I got it from him there was no fire. There was a short in the wiring that scorched some paint. I asked him what he did about it and he said he had fixed it temporarily and that he wanted it rewired. I told him to go ahead and have it rewired. So far as I know, he had that done and put a new junction box in at that place." [The last three sentences refer manifestly to Captain Lancaster

who had been referred to just prior to the quoted question and answer.]

4. The bill contained these items: "Check batteries disconnect and recharge * * Check wiring circuits for grounds, Check generator for output and charged batteries, Repaired hot water heater, * * Refilled all batteries, Changed and installed new terminals as needed, * * * Repair electrical wiring in engine room, starboard side, where damaged by fire. Also, repaired wiring under shower room * * * Check and overhaul three (3) toilets as directed by captain * * *" [Emphasis supplied.]

Captain Lancaster, were negligent in failing to maintain the wiring of the vessel in a safe condition, and such negligence was the proximate cause of the injury to claimants herein."

A close examination of the evidence touching these findings and conclusions of the court will demonstrate that the proof was not of such character as to justify the inference of negligence made by the court. It was undisputed that Miami was advised by appellant and his close friend Howcroft who assisted in preparing the Ronar for use, that some wires had shorted in the engineroom—where the fire did not start—and that the wiring which had been taped temporarily was replaced and a proper junction box installed, and that whatever danger may have been occasioned by this wiring defect had been completely remedied.

The evidence contains intimations, chiefly in questions asked on cross-examination by claimants' attorneys, that possibly Chris Craft, the manufacturer of the Ronar had not, under its general practices, installed in the Ronar wire of the best kind for vessels, but there was no tangible proof of this. Liability in such matters arises, not from failure to attain perfection, but from failure to observe reasonable care. Here the evidence was undisputed that any deteriorated wire was replaced with proper new wire.[5]

The proof which came nearest to furnishing a basis for the court's finding of negligence related to the batteries and their tendency to lose their charge. The quotation from Miami's bill, footnote 4 supra, coupled with the testimony of its manager and the appellant, shows that it was instructed to check the batteries and the wiring and make the installations necessary to put them in proper shape, and that this was done. The only evidence of battery trouble was given by Captain Lancaster.[6] He testified that the batteries were placed upon charge during the hours he was on the craft, and disconnected when he departed each afternoon. When he would return in the morning some of the batteries would be run down. It was his opinion that the failure of the batteries to hold the charge placed in them was attributable to their age.[7] He further testified that during the two to five days he had been charging the batteries, he was experimenting to see if they were usable since new batteries would run high in cost. The Captain testified upon cross-examination that the tendency of the batteries to lose their charge "could" be indicative of bad wiring.[8]

5. This was chiefly wiring where connections were made with new pumps and with repaired toilets, refrigerators, and similar items. There was no proof of any wiring condition which might produce a fire hazard which was not properly corrected by replacing with new wire.

6. The court characterized him as a "double witness." He had been the employee of Rooney, but had manifested some animus against appellant and feeling in favor of the claimants based upon his friendship with some of them and upon his opinion which he had expressed that all of them ought to be paid because "after all the boat was fully covered by insurance." He had had trouble with the same insurance company about ten years before the trial.

7. "The batteries would go down every night, indicating that the batteries were of a certain age, that they wouldn't hold a charge. * * * We assumed the batteries were going dead from age. They were, I guess, about four years old, and usually two years is the life of a battery, three at the most."

8. On this vital point his testimony will be reproduced.

"Q. You said the batteries leaked. Did that cause the vessel to be unsafe in any way? A. I don't think I said they leaked.

"The Court:

"He said they ran down.

"Q. Did that cause the vessel to be in any way unsafe? A. It could.

"Q. How is that? A. It could be caused from bad wiring or a short circuit or grounding of some type that would cause them to go down.

"Q. You mean you left the boat at 4:30 that afternoon with a possibly unsafe condition, is that what you mean to say? A. No.

The claimants attempted to use the testimony of Captain Lancaster concerning the batteries as the basis for hypotetical questions in an attempt to prove that this experience with the batteries was sufficient to put appellant on notice that a probably unsafe condition was indicated. Three expert witnesses were used, Hays, a marine consultant, Davis, Fire Marshal of Miami, and Hainlin, a mechanical and electrical engineer. Hays was askd no question about the condition of the batteries and gave no opinion as to what, if any, connection they might have had with the fire.

> "Q. Can you tell me now what you mean to say? A. The boat was not seaworthy.
>
> "Mr. Anderson:
>
> "That's not what I asked * * *
>
> (The question was read by the reporter.)
>
> "A. That's a hard question to answer.
>
> "Q. You do your best. A. Any boat you see anywhere might possibly be unsafe. If I had thought for a minute the boat was unsafe to be left at the dock I wouldn't have left it. I would have taken corrective measures.
>
> "The Court:
>
> "You mean to say so far as you know it was not unsafe but you realized that any boat might be unsafe without the captain not [sic] knowing it?
>
> "The Witness:
>
> "That is correct.
>
> *       *       *       *       *
>
> "The Court:
>
> "He is clear about it. So far as he knows it was not in unsafe condition but he said it was possible—he wouldn't know."

Later, when Lancaster was placed upon the stand by the claimants he stated:

> "My first thoughts about the whole thing was the fact the batteries were about four years old, and the fact they had been left in a discharged condition all summer. It was my thought that the batteries were deteriorated to the extent they wouldn't hold a charge, but we were trying to save the expense of new batteries by giving them a fair chance to come back to life."

9. "Q. Captain assume that a fire breaks out on a 55-foot Diesel motor yacht on or about 6:00 P.M., January 16, 1957. Assume that this yacht is moored at a

Davis gave no direct testimony concerning any causal relationship the batteries might have had with the fire. After several hypothetical questions had been phrased and objected to, he was asked a question calling upon him to give his opinion of the cause of the fire to which he responded: " * * * my assumption would have to be that it was from some electrical cause.[9] Hainlin was queried by hypothetical questions concerning the batteries including the statement that they discharged themselves during the nighttime for five successive nights and was asked: "Q. Could

yacht basin with no crew aboard. Assume that at 4:30 p. m. the previous day the captain had completely checked the vessel for lighted cigarettes or smoldering fires. Assume that there is no evidence of arson, [after the fire the charred remains turned up a lock to the salon in unlocked position together with the key, which was also found nearby] and assume that the vessel had been completely locked, and the only windows left open were small portholes in the engine room. Assume that the wheelhouse of the yacht had all its windows closed, and assume there was a pasteboard box in the wheelhouse containing cans of paint and varnish remover and a bundle of clean rags, and assume that the vessel was not struck by lightning. Assume that there had been a previous electrical fire in the wiring system of the yacht and following that fire no visual inspection was made of the circuits but only a meter check.

> "As a fire prevention expert would you have an opinion as to the cause of that fire?
>
> *       *       *       *       *
>
> "The Court:
>
> "*There has been no evidence of anything, just a fire not in the wheelhouse but in the salon.*
>
> *       *       *       *       *
>
> "A. I would say that unless the wiring had been checked out by a competent electrician, and not checked out with an ohmmeter which only gives you a reading of the amount of resistance in a wire and not what is wrong with the wire—it just gives the resistance of the wire—with all those things *my assumption would have to be that it was from some electrical cause. * * *"* [Emphasis added.]

this cause a fire in the circuit?" And he answered: "It likely could, yes." [10]

That is the closest approach to an answer upon which the finding of the court that the fire resulted from a defect in the electrical system could be based, and we do not think that this answer, together with the others quoted, was sufficient in law to constitute a legal basis for the finding. The evidence relied upon established nothing more than a possibility that the recurring discharge of the batteries was caused by a short circuit in the wiring of the vessel. It is not sufficient that the finder of facts is warranted in concluding that the alleged negligent condition could possibly have caused the damage claimed. It is necessary that the proof go further and establish the conclusion as a reasonable probability. Theriot v. Mercer, 5 Cir., 1959, 262 F.2d 754; Deitz v. Greyhound Corporation, 5 Cir., 1956, 234 F.2d 327; Geigy Chemical Corp. v. Allen, 5 Cir., 1955, 224 F.2d 110, and Reuter v. Eastern Air Lines, 5 Cir., 1955, 226 F.2d 443, 446, where we stated: "The requirement is for probative facts capable of supporting, with reason, the conclusion expressed in the verdict."

As against this unsatisfactory evidence the record contains the testimony of McClaskey, a marine surveyor, Jones, an independent marine surveyor, Tryon, fire inspector for the City of Miami Fire Prevention Bureau, and Goeriz, a special agent for the National Board of Fire Underwriters, all men of extended experience who, along with certain officials of the City of Miami, made a study last-ing several days of the remains of the fire aboard the Ronar and were unable to find any condition which could have contributed to the starting of the fire. In addition to their inspection they conferred with the captain and other persons having knowledge of what had been done aboard the Ronar during the days preceding the fire. The witness Jones, based doubtless upon his finding the salon lock in unlocked position, concluded that the fire was of "incendiary nature." Each of them rejected the conclusion that the electrical system of the boat had anything to do with the fire.

The parties do not cite many cases and there seems to be no sharp divergence between them as to what the law is.[11]

We think that the trial judge accurately summed up the situation in the comment he made, quoted supra footnote 9, while the next to the last claimants' witness was on the stand when he said: "There has been no evidence of anything, just a fire not in the wheelhouse but in the salon;" and when he said later: "It is anyone's guess." We think that the evidence is without substantial dispute and that it is sufficient only to warrant speculation or conjecture that claimants' explanation of the origin of the fire was the correct one; and that it is not of sufficient probative value to establish the negligence upon which claimants rely to sustain their claims for damages. After a careful analysis of the evidence, calling as it does, not for an appraisal of the credibility of the witnesses, but for deductions from prov-

10. These responses to hypothetical questions were not so much answers of experts based upon their scientific knowledge or specialized training as they were deductions resulting from the exercise of the witnesses' reasoning powers leading to a certain conclusion because all other hypotheses had, by the questions, been eliminated. They partake, therefore, more of the nature of argument than of testimony.

11. Cf. generally Coryell v. Phipps, 1943, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363, affirming decision of this Court reported in 5 Cir., 128 F.2d 702; Pennsylvania Railroad Co. v. Chamberlain, 1933, 288 U.S. 333, 53 S.Ct. 391, 77 L. Ed. 819; Benedict on Admiralty, 6th Edition, Vol. 3, p. 357; Merchants' Transp. Co. v. Daniel, 1933, 109 Fla. 496, 149 So. 401; Arkin Construction Co. v. Simpkins, Fla.1957, 99 So.2d 557; The Gothland, 1859, 23 How. 491, 64 U.S. 491, 16 L.Ed. 516; and The Ellenor, D.C.S.D.Fla.1941, 39 F.Supp. 576, affirmed by this Court, Freeman v. A. H. Bull S.S. Co., 5 Cir., 125 F.2d 774.

en facts, we feel that the conclusion of law made by the trial court was based upon nothing more substantial than *post hoc ergo propter hoc;* and we are left with the definite and firm conviction that a mistake was committed in the entry of judgment for the claimants. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; C. J. Dick Towing Co. v. The Leo, 5 Cir., 1953, 202 F.2d 850; and West v. United States, 3 Cir., 1957, 246 F.2d 443.

The judgment of the district court is therefore reversed and judgment rendered here in favor of appellant.

Reversed and rendered.