ROCKWOOD & CO. et al. v. AMERICAN PRESIDENT LINES, Limited, et al.

SAME v. SEABOARD MARINE REPAIR CO.

AMERICAN PRESIDENT LINES, Limited, v. SAME.

THE PRESIDENT JACKSON.

Nos. 191a, 192a, 263a.

District Court, D. New Jersey.

Oct. 25, 1946.

Carpenter, Gilmour & Dwyer, by Samuel M. Coombs, Jr., all of Jersey City, N. J., and Bigham, Englar, Jones & Houston, by Henry N. Longley and John W. R. Zisgen, all of New York City, for Rockwood & Co. et al.

Lindabury, Steelman, Zink. & Lafferty, of Newark, N. J., and Dow & Symmers, of New York City, by Richard F. McMahon, of Montclair, N. J., and William G. Symmers, of New York City, for American President Lines, Limited.

John G. Flanigan, of Jersey City, N. J., and Macklin, Brown, Lenahan & Speer, by Leo F. Hanan, all of New York City, for Seaboard Marine Repair Co.

FAKE, District Judge.

Since the pleadings herein disclose the issues before the court, and the findings of fact in connection therewith are full and complete, it is not necessary to encumber the record with extended recitals. However, to understand the reasoning which leads to the conclusion, it is necessary briefly to repeat from the evidence and the findings of fact.

The cargo libellants herein seek recovery for cargo losses sustained by fire and water aboard the S. S. President Jackson. They charge negligence against the respondents, Seaboard Marine Repair Company, an independent contractor which was engaged in certain acetylene torch operations aboard the ship on the day of the fire, and also against American President Lines, Ltd., the owner of the vessel. The latter in turn, alleges negligence against the Repair Company and seeks to hold it solely liable.

It appears from the findings of fact that at 8:30 A. M. on the morning of June 6, 1941, the Repair Company, by its agents and employees, was at work using an acetylene torch in the burning off of a certain eye bolt attached to a door frame of a refrigerator box. In the testimony this box is designated as refrigerator "A" and is located on the port side of the vessel at the fourth level below decks. The burning off at that point was completed at about 9:00 A. M. and the employees moved their operations over to the starboard side of the vessel. The point at which the burning off was done was about 15 to 18 inches forward from the forward end of what is termed the port trunk.

### Description of the Port Trunk.

The port trunk is in the nature of a shaft 15 feet long and 8 feet, 6 inches wide extending from the first deck down to the bottom or floor of the fourth deck and 8 to 11 feet between decks. It was enclosed on all four sides by steel plating from the first deck down to and including the second deck and from thence downward, three sides were thus enclosed. At each deck, removable floors encased in metal were set in position acting as floors below and ceilings overhead. These were placed in position as the trunk was stowed. From the second deck downward, the inboard side of the trunk was not steel-enclosed but in lieu thereof slots were provided to take battens. These battens were placed between decks perpendicularly. They were 2 inches thick by 6 inches wide and were placed on 8-inch centers, thus leaving openings of 2 inches between the battens.

At the fourth deck wherein the fire occurred, not only the inboard side of the trunk was thus battened, but the forward end was also battened for a distance of about 2 feet extending at right angles in an outboard direction to meet steel plating at that point. It was in proximity to the corner thus formed that acetylene burning was done.

### Use of the Acetylene Torch.

The work of cutting the eye bolt by means of the acetylene torch was accom-

plished in the following manner, and under the following conditions: The eye bolt was annexed to the door frame of a refrigerator at a point 15 to 18 inches away from the battens. Celerio placed the shield of asbestos in position against the upright cargo slats. It was 2 to 2½ feet wide and 4 feet long. Thus covering the entire width of the exposed slats and 4 feet perpendicularly. The evidence shows it was so placed that the top thereof was above the heads of the workmen, close to, if not entirely up to, the underside of the third deck and ceiling over the workmen's heads. The helper, Celerio, held the shield in this position while Masters burned off the eye bolt. The acetylene torch and handle is 18 inches long and it shoots its flame at right angles from the end thereof out of a nozzle 4 inches long at right angles from the end. Masters placed the torch against the eye bolt so the flame of the torch was directed at right angles away from the shielded battens so the molten sparks would normally fly downward and away from the battens toward the door opening.[1] They had with them a pail of water and a fire extinguisher in addition to the asbestos above mentioned.

### Origin of Fire.

The fire was discovered at 1:35 P. M., some 4½ hours after the acetylene burning operation was completed. The area of burning was in the trunkway above described, on the fourth deck level, at about the center of the 15-foot length of the trunkway and some distance below the deck head or underside of the third deck. This deck head was of wood, wholly encased with metal, and no wood was exposed on either side thereof.

At the fourth deck level there was a passageway extending along the inboard side of the 15-foot length of the trunkway and there was an overhead electric light fixture midway therein adjacent the battens. After the fire it was discovered that although the fixture, and the wire connections thereto, were constructed in a fireproof and waterproof manner, yet nevertheless, this fixture was burned out, and the underside of the third deck showed evidences of heat and burning for a considerable distance around the fixture. The battens opposite the fixture also evidenced scorching.

Before there can be a recovery by libellants in this case the court must be convinced by a preponderance of the evidence that the fire which took place in the center of the trunk a short distance below the top or ceiling of the fourth deck was caused by the use of the acetylene torch.

There is nothing in the case which discloses that any spark or sparks entered the trunk from the acetylene torch. It is not understood nor was it argued to the court that the question here falls within the doctrine of Res Ipsa Loquitur, therefore libellants cannot recover in the absence of proof tending to show proximate cause.

An expert witness, W. R. Bagger, testified that a spark might have entered the burlap through one of the 2-inch spaces and might have traveled along some 7½ feet through the stowed burlap bags and caused a fire at the point disclosed. However, this is a mere surmise, there is no evidence that any such spark so traveled. Moreover, as a trier of fact, it is as easy for me to assume that the fire had its origin in the apparently defective electric connections or that through an oversight or carelessness, something of a combustible nature, such as a cigarette butt might have started it or still further, it is equally as easy to assume that it was caused by spontaneous combustion. The last conclusion would be based on the testimony of Fire Chief McCarthy to the effect that vegetable oil in contact with burlap might cause spontaneous combustion. When asked whether chocolate contains vegetable oil, he said he did not know. In this connection I have taken the liberty to refer to "Chemical Encyclopaedia" by C. T. Kingzett, 3rd Ed., Page 73, and there it appears that "chocolate is a preparation of roasted cacao beans without the abstraction of the butter and always contains sugar and added cacao butter." In cacao beans "The fat ranges from 50 to 56%." This, of course,

---

[1] I am not unmindful that heat sparks might fly in all directions. This carries little weight in view of the precautions taken and the probabilities involved.

indicates vegetable oil. However, since I do not conclude that this was the cause of the fire, it has no bearing here other than to point out one of at least three possibilities to be gathered from the evidence in the absence of direct proof.

If it could be said that the use of the torch, as here disclosed, in the absence of evidence of combustible gases, was negligence per se, it would still be necessary to find that such negligence was the proximate cause of the fire. This I am quite unable to do without entering the sphere of suspicion and guesswork. It is my view that these workmen exercised all the care and caution to be expected of reasonably careful men under all the circumstances presented by the evidence in this case.

■ My conclusions with relation to the respondent Repair Company are twofold: (1) It has not been proved by any direct evidence, or by inferences from the evidence adduced, that the use of the acetylene torch was the proximate cause of the fire; (2) No negligence has been proved against it.

These conclusions are dispositive of all other issues in the case. The Steamship Company cannot be held guilty of negligence in the absence of negligence against the Repair Company. Moreover, the proof of "neglect" required by the statute, Title 46 U.S.C.A. § 182, has not been met.

A decree will be entered in conformity herewith.