**WESTINGHOUSE ELECTRIC CORPORATION, et al., Plaintiffs-Appellees Cross-Appellants,**

v.

**M/V "LESLIE LYKES", etc., Defendant,**

**Lykes Bros. Steamship Co., Inc., Defendant-Appellant Cross-Appellee.**

**No. 82–3128.**

United States Court of Appeals, Fifth Circuit.

June 14, 1984.

Rehearing and Rehearing En Banc Denied July 13, 1984.

Terriberry, Carroll, Yancey & Farrell, Alfred M. Farrell, Jr., New Orleans, La., for defendant-appellant, cross-appellee.

Bigham, Englar, Jones & Houston, James H. Simonson, New York City, Montgomery, Barnett, Brown & Read, Henry J. Read, New Orleans, La., for plaintiffs-appellees, cross-appellants.

Before BROWN, WISDOM and JOHNSON, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This is a suit by a shipper of cargo against an ocean carrier for damage to cargo resulting from a fire aboard ship. One issue concerns the effect of an unseaworthy condition on the burden of proof in a carrier's defense under the Fire Statute, 46 U.S.C. § 182, which requires that the fire be caused by the "design or neglect" of the owner, and under the Carriage of Goods By Sea Act, 46 U.S.C. § 1304(2)(b). After a traditional bench trial, the District Court held that the carrier was not entitled to the exoneration provided by the Fire Statute, because it found the fire to have been "attributable to the management level of Lykes." Because the District Court's factfinding was influenced by a view of the Fire Statute that we reject, and its findings did not center on the essential element that the fire must have been caused by the

"design or neglect" of the shipowner, we reverse the decree in favor of Cargo. We also reject Cargo's purported cross-appeal of the trial court's conclusion that the Master's decisions in fighting the fire were not attributable to the owner under the Fire Statute.

### Facts and Decision Below

In August of 1976, Westinghouse Electric Corp. (*Cargo*) shipped several large electric rotors aboard the SS LESLIE LYKES (LESLIE) owned by Lykes Brothers Steamship Co., Inc. (Carrier). The LESLIE was an ocean-going steamship used to transport break-bulk or general cargo.

The LESLIE contains six cargo holds. The No. 3 hold is divided into three horizontal compartments. The bottom compartment is the lower hold, also referred to as the dry cargo hold. Above the lower hold is the lower tween deck (LTD), in which the fire occurred. The top compartment is the upper tween deck, which is immediately below the main deck or weather deck. Each deck has a MacGregor hatch cover, which opens in accordion fashion, consisting of panels attached by hinges, positioned on rollers. The hatch covers are activated hydraulically.

The No. 2 hold, which is immediately forward of No. 3 hold, has the same overall structure as No. 3. Both No. 2 and No. 3 contained a vertical ladder running the depth of the ship. At each level or compartment was a manhole for entry into the next deck via the ladder. One purpose of these accessways was to allow the crew to take periodic checks to confirm the security of the cargo. The accessway manhole in the No. 3 hold was at the forward bulkhead between No. 3 and No. 2 holds. The accessway in the No. 2 was aft, also at the bulkhead between No. 3 and No. 2 holds. The entrance to No. 3 manhole is at the top of the motor/generator house located on the weatherdeck.

The No. 4 hold was situated immediately aft No. 3 hold. Unlike holds No. 2 and No. 3, hold No. 4 was divided into three vertical compartments so that containers could be stowed within the hold. The vertical divisions ran fore and aft. The accessway in No. 4 was located at the forward bulkhead between the No. 4 and No. 3 holds.

On the voyage in question (Voyage 64), two Westinghouse rotors were being shipped in separate containers in No. 4 hold. In addition to this cargo, bags of flour were stowed in open spaces in No. 4 hold.

Among the cargo stowed in the No. 3 LTD were bales of cotton. Cotton is flammable and, if ignited, is very difficult to extinguish. Baled cotton can smolder indefinitely, even under water, because there is a source of oxygen within the cotton fibers themselves. Between the starboard bulkhead and the cotton was a stow of drill pipe running fore and aft. The pipe stow was secured properly by chains, which were tightened by turnbuckles.

The LESLIE sailed from her last port of call (Charleston, South Carolina) on the evening of August 27, 1976. On August 29th, the vessel encountered rough weather, the seas rolling heavily due to the fact that the vessel was sailing on the edge of a hurricane. Though the weather was rough, it was not unusual or unexpectable.

At 2315 hours on August 31, 1976, a clanking noise was heard by members of the crew, which they believed at the time had come from the No. 4 hold. No attempt was made by the crew to investigate the clanking sound at that time, even though there was access into No. 4. At the time the noise was heard, the vessel was still sailing in rough seas.

At 1212 hours on the following day, roughly twelve and one-half hours after the clanking was heard, smoke was observed from the bridge by Captain Metcalf, master of the vessel, coming from the kingpost forward of the No. 3 hold. The smoke detector system indicated that a fire was in the No. 3 LTD. Although an access way was provided in No. 3 hold, access could not be obtained into No. 3 LTD because

bags of flour had been stowed over the manhole cover in No. 3 upper tween deck.

A thermometer was placed in the No. 4 hold at the hottest spot on the bulkhead between No. 4 and No. 3, in order to monitor the temperature and status of the fire. The thermometer placed at the starboard side of the forward bulkhead of No. 4 hold originally indicated a temperature of 130 degrees. The bulkhead temperatures indicated that the fire was in the vicinity of the starboard aft section of No. 3 LTD, where the cotton and drill pipes had been stowed.

The vessel was equipped with a $CO_2$ injection system in each hold. Therefore, the weatherdeck hatch of the No. 3 hold was sealed with tape to prevent as much as possible the leakage of $CO_2$. Also, the blowers of the vessel's ventilator system were shut off and taped to avoid providing the fire any ventilation.

Captain Metcalf ordered the release of 24 bottles of $CO_2$ into No. 3 LTD, in accordance with the directions provided by the manufacturer of the $CO_2$ system. Pursuant to those instructions, the crew continued to introduce $CO_2$ into No. 3 LTD until the vessel arrived at El Ferrol, Spain, at which time the thermometer that had been placed on the bulkhead indicated the temperature had dropped to 110 degrees.

Soon after the introduction of $CO_2$, the smoke abated, as indicated by the smoke detector. Neither the smoke detector nor the kingpost ventilator revealed any indication of smoke from September 1st until the opening of the No. 3 weatherdeck hatch at El Ferrol on September 8.

The vessel had left Charleston with 72 full cannisters of $CO_2$. By the time it reached El Ferrol, only 2 cannisters remained full. Due to the concern that the supply of $CO_2$ might run low, steam was introduced into No. 3 LTD, in addition to the insertion of $CO_2$ into the compartment. This was accomplished by drilling five $1/2$- to $3/4$-inch holes in the bulkhead of No. 4 hold just above the location of the stow of drilling pipes located in No. 3 LTD. Steam lances were inserted into the holes.

While at sea, Captain Metcalf discussed the events taking place with Lykes' managing personnel at New Orleans by radiotelephone each day, from the time fire was first detected. He considered and followed some suggestions for fighting the fire made by Lykes' vice-president in charge of maintenance and repair, Joseph Bernstein.

Mr. Lucian Castro, then a supervisory port engineer for Lykes in New Orleans, was sent to meet the vessel at El Ferrol for the purpose of rendering the master any assistance and advice that he could. Castro was sent because he was considered to be knowledgeable and experienced in cotton fires. Castro prepared himself for the journey and task by reviewing the stowage plan for the voyage, the vessel's $CO_2$ system, and bringing available foam and other chemicals for extinguishing cotton fires.

When the vessel arrived at El Ferrol on September 6 at about 1818 hours, Captain Metcalf held an informal meeting in his cabin to discuss what action would be taken. Numerous Spanish firefighting authorities and port officials, including representatives of the Spanish Navy and the Navy's firefighting school, were present. Also attending were Castro and the ship's chief engineer.

Captain Metcalf decided at the conclusion of the meeting that an access hole would be cut in the bulkhead between No. 3 and No. 4 holds, at the point of highest temperature. This was done in order to see into the No. 3 LTD, inspect the status of the fire and, if necessary, fight the fire from its own level through the access hole.

The access hole was cut in the same location on the bulkhead where the steam lance holes had been drilled, beneath an athwartship walkway which ran along the forward bulkhead in No. 4 hold. In order to cut the hole, which was accomplished by drilling several contiguous holes, bags of flour stored in the No. 4 hold were moved to provide sufficient work space. A cover was made for the approximately 18″ by 24″ access hole in an attempt to keep the compartment as airtight as possible.

After the access hole was completed, on September 7th, Castro and John Ebanks, the boatswain, attempted entry through the access hole in order to assess the status of the fire. Hoses were run from the vessel's compressed air supply, through a makeshift filter consisting of paper and a miner's type mask, in order to afford them adequate air supply.

Ebanks successfully entered No. 3 LTD and Castro partially entered. After entering the hold, Ebanks stood on top of the drill pipe stow in order to look around. He then sprayed water over the cargo in the compartment to see if smoke would rise, in order to establish the existence or nonexistence of a fire. No signs of smoke were visible to either party.

Due to the extreme heat, Castro ordered the ventilator system's fan turned on momentarily. As a result, No. 3 LTD compartment became pressurized and $CO_2$ was forced out of the compartment into No. 4 hold. Members of the crew standing by in No. 4 hold were overcome by the gas as a result of not wearing masks. Additionally, Castro, whose mask became dislodged when he turned to leave the area, passed out and was taken to the hospital. Ebanks was also overcome due to the fact that the hose to his mask did not reach as far as he had ventured at the time the compartment was pressurized.[1]

Shortly after evacuation of the crew members from No. 4 hold, foam was introduced into No. 3 LTD compartment via the access hole. The foam was designed to accomplish the same thing as $CO_2$, namely, to keep oxygen from the fire. This was done by the Spanish Navy Fire Control Unit about 3½ hours after the entry of the boatswain into the compartment.

On the following morning, September 8th, at 0905 hours, the weatherdeck hatch-cover of No. 3 hold, leading into No. 3 upper tween deck, was opened. When the hatch cover was first opened, little smoke was seen. The Spanish firefighters, there to assist in fighting the fire, entered the

upper tween deck and removed two pieces of heavy lift equipment so that the hatch cover over the lower tween deck could be opened. The heavy lifts prevented entry because they were stored over the hatch cover.

As attempts to open the hatch cover over No. 3 LTD commenced, smoke was seen emanating from the compartment below through the cracks between the sections of the hatch cover. Before the hatch cover could be completely opened a "whoosh" was heard and flame erupted from the hold, followed by a dull explosion. Firefighters immediately began flooding No. 3 hold with hoses from the top and from the bottom through the use of bilge pumps.

At about the same time that the flooding of No. 3 hold commenced, smoke was detected in both No. 4 and No. 2 holds. Those fires had been caused by the conduction of heat through the No. 3 bulkheads. By that time, the fire in No. 3 hold had spread throughout most of the compartment. Stored near the bulkheads in each hold were bags of flour. Fire hoses were placed in the access manhole of No. 4 hold and tied to secure a direct stream toward the forward bulkhead, where it was believed the fire was coming from. Hoses were also used to fight the fire in No. 2 hold.

Both No. 3 and No. 4 holds were filled with salt water, inundating the Westinghouse rotors. Thus, some of the ship's cargo was badly damaged, if not ruined. Nevertheless, the firefighting efforts extinguished the fire, saved the lives of the crew, the ship, and most of the cargo, including some of Westinghouse's cargo.

After the fire was extinguished and the holds were emptied of water, a turnbuckle securing one of three chains surrounding the pipe stow in the starboard side of No. 3 LTD was found to have been broken. The remaining two chains securing the starboard pipe stow were unbroken and still held the stow intact.

---

1. This incident was the subject of personal injury suits by several crewmen. *Ivano v. Lykes*

*Brothers,* 729 F.2d 778 (5th Cir.1984) (unpublished opinion).

Cargo brought an action against Carrier for damage to its cargo, and Carrier asserted the defense of the Fire Statute,[2] which was preserved and incorporated into the Carriage of Goods By Sea Act.[3] The District Court explained that, under the reasoning of *Sunkist Growers v. Adelaide Shipping Lines, Ltd.*, 603 F.2d 1327 (9th Cir.1979), the Carrier may not be exonerated under the Fire Statute unless he first bears the burden of proving that he used due diligence to provide a seaworthy ship or that any unseaworthy condition did not cause the fire and resulting damage. Pursuing this approach, the District Court concluded

that Lykes failed to exercise due diligence in providing a seaworthy vessel in its stowing bags of flour over the manhole access way to No. 3 lower tween deck. The manhole was not fit for its intended use, and as a result, rendered the LESLIE LYKES unseaworthy. This unseaworthy condition was a proximate cause of the fire and resulting damage to the cargo.... Thus, under the holding *Sunkist Growers* Lykes would be barred from asserting the fire defense.

The District Court alternatively cited older Supreme Court and Fifth Circuit cases which squarely hold that proof of due diligence to make the vessel seaworthy is not a precondition to the exoneration provided by the Fire Statute. This did not change the result below, because the District Court, as if to reason

For want of a nail, the shoe was lost;
For want of a shoe, the horse was lost;
For want of a horse, the rider was lost;
For want of a rider, the battle was lost,

found, "through a combination of common sense, circumstantial evidence and expert testimony," that Cargo had carried its burden imposed by the Fire Statute by proving that the damage to its cargo

was caused by the fire fighting efforts, which were caused by the fire,

which was caused by a spark emitted from the broken turnbuckle,

which was caused by the looseness of the chain,

which was caused by the failure of the crew to tighten the turnbuckle during the voyage,

which was caused by the failure of the crew to enter No. 3 LTD during the voyage,

which was caused by the lack of access into No. 3 LTD without removing flour sacks,

which was caused by the covering of the access manhole,

which was caused by the stowage plan, which was caused by the cargo planners in Lykes' New Orleans office,

**2.** The Fire Statute provides:

No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner.

46 U.S.C. § 182.

**3.** The Carriage of Goods By Sea Act provides:

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

\* \* \* \* \* \*

(b) *Fire*, unless caused by the actual fault or privity of the carrier;

46 U.S.C. § 1304(2)(b).

The Carriage of Goods By Sea Act specifically incorporates and carries forward the terms of the Fire Statute. Even more important, COGSA

§ 1308 expressly provides that other provisions of the Act (*see, e.g.,* § 1303(1), (2)) shall not affect the rights and obligations of the Carrier under the Fire Statute (§ 182).

The provisions of this chapter shall not affect the rights and obligations of the carrier under the provisions of the Shipping Act, 1916, or under the provisions of sections 175, 181 to 183, and 183b to 188 of this title or of any amendments thereto; or under the provisions of any other enactment for the time being in force relating to the limitation of liability of the owners of seagoing vessels.

46 U.S.C. § 1308.

It has long been held that the COGSA fire exemption and the Fire Statute exemption are the same, *e.g., Complaint of Ta Chi Navigation (Panama) Corp.*, 677 F.2d 225, 228 (2d Cir.1982), except that COGSA extends to the "carrier," not just the "owner" as in the Fire Statute. *See* 2A Benedict on Admiralty § 147 (7th ed. 1983).

which decision by the cargo planners was negligence, and was within the "actual fault or privity" of the owners of the LESLIE.

The District Court found it unnecessary to decide whether the elaborate firefighting efforts were negligent, because it found that they were controlled, at sea and in the foreign port, by the Master, not by Castro or Bernstein. Thus, the decisions made in the firefighting process were not caused by the "actual fault or privity" of the owners of the vessel.

Lykes appeals contending that (1) there was no proof that the fire (or fire damage) was caused by the "design or neglect" of the owner, and (2) the trial court erroneously relied on the Ninth Circuit's decision in *Sunkist.* Cargo filed a purported "protective cross appeal" to preserve for appeal, if we reversed the District Court on the Fire Statute, its objection to the District Court's finding that the firefighting decisions—and practices—were not attributable to the owner.

### Proof Under the Fire Statute

An improper analysis of the burden of proof, and more importantly, of *what must be proven* to overcome the fire defense sparked the District Court into finding an extremely loose chain of causation, which, if accepted, would convert virtually any unseaworthy condition into "actual fault or privity" of the owner.

 In a maritime cargo claim, the initial burden is on Cargo (shipper) to prove "good order-bad order"—that he delivered the goods to the carrier in apparent good order and condition and that, upon return, they were damaged. 46 U.S.C. § 1303(4); *Blasser Bros., Inc. v. Northern Pan-American Line,* 628 F.2d 376 (5th Cir. 1980); *Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225 (11th Cir.1983). Once Cargo has done so, the burden shifts to the Carrier to prove that the harm was caused by one of the statutorily excepted causes. 46 U.S.C. §§ 1302, 4(2); 46 U.S.C. § 182; 628 F.2d at 381. Loss resulting from fire is one of these perils excepted (more so

than other perils) from the general liability of the carrier for damage sustained while the goods are in his possession. 46 U.S.C. § 1304(2)(b); 46 U.S.C. § 182. There is no doubt that in this case Cargo has proved good order-bad order, and that Carrier has proved that the loss resulted from fire. Once a fire exists, the defense of fire also protects the Carrier from losses resulting from steps taken to extinguish the fire, provided there is no actual fault or privity of the owner concerning the firefighting efforts. Thede, *Limitation of Liability and the Fire Statute,* 45 Tul.L.Rev. 959, 981 (1971). *See, e.g., Complaint of Caldas,* 350 F.Supp. 566 (E.D.Pa.1972), *aff'd,* 485 F.2d 680 (3d Cir.1973); *Great Atlantic & Pacific Tea Co. v. Brasileiro,* 159 F.2d 661 (2d Cir.1947); *La Territorial De Seguros v. Shepard SS Co.,* 124 F.Supp. 287, 289 (E.D.N.Y.1954).

 Once the Carrier shows that the loss or damage was caused by fire, the burden of proof shifts back onto Cargo to prove that the fire was "*caused* by the design or neglect" of the shipowner. Thus, the burden is on the Cargo to identify by a preponderance of the evidence the cause of the fire, and also to establish that the cause was due to the "actual fault or privity" of the Carrier. Comment, *The Elements of the Burden of the Proof under the Carriage of Goods By Sea Act,* 12 Colum.J.Trans.L. 289, 298 (1973); *Thede, supra,* 45 Tul.L.Rev. at 985; 2A Benedict on Admiralty § 143 (7th ed. 1983) (citing cases); *Fidelity Phenix Fire Ins. Co. v. Flota Mercante Del Estado,* 205 F.2d 886, 887 (5th Cir.1953); *Complaint of Ta Chi Navigation (Panama) Corp.,* 677 F.2d 225, 228 (2d Cir.1982); *Asbestos Corp. v. Compagnie De Navigation,* 480 F.2d 669, 672–73 (2d Cir.1973). *See Blasser Bros. Northern Pan-American Line,* 628 F.2d 376, 382 (5th Cir.1980); *Nitram, Inc. v. Cretan Life,* 599 F.2d 1359, 1373 (5th Cir.1979). Moreover, Cargo's burden is not satisfied by proving that the fire was caused by the negligence of the master or crew. "Neglect of such owner" means personal neglect of the owner, or, in case of a corpo-

rate owner, negligence of its managing officers or agents. *Earle & Stoddart, Inc. v. Ellerman's Wilson Line, Ltd.*, 287 U.S. 420, 424–25, 53 S.Ct. 200, 200–01, 77 L.Ed. 403 (1932); *Alfa Romeo, Inc. v. SS Torinita*, 499 F.Supp. 1272, 1282 (S.D.N.Y.1980), *aff'd*, 659 F.2d 1057 (2d Cir.1981); *Complaint of Caldas*, 350 F.Supp. 566 (E.D.Pa. 1972), *aff'd*, 485 F.2d 680 (3d Cir.1973).

Not following this time honored approach, the District Court instead [4] emphasized the Ninth Circuit's decision in *Sunkist Growers, Inc. v. Adelaide Shipping Lines, Ltd.*, 603 F.2d 1327 (9th Cir.1979), *cert. denied*, 444 U.S. 1012, 100 S.Ct. 659, 62 L.Ed.2d 640 (1980), and held that the burden of proof is on the Carrier to show that it exercised due diligence to provide a seaworthy ship as a precondition to invoking the defense of § 1304(2)(b) and the Fire Statute. 603 F.2d at 1336.

■ We need not look far upward to reject the Ninth Circuit's construction of the Fire Statute. In *Earle & Stoddart v. Ellerman's Wilson Line*, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 (1932), the very same argument was made and squarely rejected by the Supreme Court. There the Court explained:

> But the Act does not purport to create any general duty on the part of shipowners. Its requirement of due diligence is imposed as a condition of securing immunity from liability for certain kinds of losses, like those due to errors in navigation or management. That the provisions of the Harter Act do not refer to liability for losses arising from fire is made clear by § 6 which declares that the Act "shall not be held to modify or repeal §§ 4281, 4282, and 4283 of the Revised Statutes,"—§ 4282 being the fire statute. The *courts have been care-*

*ful not to thwart the purpose of the fire statute by interpreting as "neglect" of the owners the breach of what in other connections is held to be a non-delegable duty.*

287 U.S. at 427, 53 S.Ct. at 201 (emphasis added). Because of this positive directive and the underlying policy of the Fire Statute, we join in the Second Circuit's recent emphatic rejection of *Sunkist*:

> When Congress wanted to put the burden of proving freedom from fault on a shipowner claiming the benefit of an exemption, it specifically said so. See 46 U.S.C. § 1304(2)(q). The *Sunkist* court would read the language of subsection (q) into subsection (b), "although Congress did not put it there." *See Lekas & Drivas, Inc. v. Goulandris, supra*, 306 F.2d [426] at 432 [(2d Cir.1962)]. This Court has not put it there either. We adhere to our prior holdings that, if the carrier shows that the damage was caused by fire, the shipper must prove that the carrier's negligence caused the fire or prevented its extinguishment. If on remand the shipper fails to meet this burden, the action must be dismissed.

*Complaint of Ta Chi Navigation (Panama) Corp.*, 677 F.2d 225, 229 (2d Cir.1982). Moreover, this Court's own precedent is incompatable with the *Sunkist* interpretation. In *Fidelity-Phenix Fire Ins. Co. v. Flota Mercante Del Estado*, 205 F.2d 886 (5th Cir.1953), we held:

> It is well settled that a shipowner is not liable for damages resulting from fire unless libellant proves that the cause of the fire was due to the "design or neglect" of the owner, the burden being upon libellant.

205 F.2d at 887. In that case, Cargo had argued that the carrier should not have the

---

**4.** The District Court declared:

> The burden which the carrier must meet under this interpretation is that it exercised due diligence in providing a seaworthy ship or that any unseaworthiness was not attributable to lack of due diligence. *Sunkist Growers, Inc., supra.*
>
> Under the Ninth Circuit's interpretation, if the carrier fails to establish that it acted in

accordance with 46 U.S.C. § 1303, or that failure to do so did not cause the fire and resulting damage, the carrier is barred from asserting the fire exemptions as a defense. *Sunkist Growers, Inc., supra.* If the carrier does meet that burden, then the burden shifts to cargo to prove that the fire was caused by the "design or neglect" or the "fault or privity" of the carrier.

advantage of the Fire Statute without first showing that the vessel had the proper equipment required by a safety statute. This Court answered:

> But the fire statute is not by its terms so conditioned. In *Earle and Stoddart v. Ellerman's Wilson Line*, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 [1932] it was said: "The fire statute, in terms, relieves the owners from liability 'unless such fire is caused by the design or neglect of such owner.' The statute makes no other exception from the complete immunity granted."

205 F.2d at 888. Moreover, COGSA expressly provides that the obligation of the Carrier under § 1303(1) to exercise due diligence to make the ship seaworthy, or under (2) to properly load, handle, stow and care for cargo shall not affect the rights of the Carrier under the Fire Statute. 46 U.S.C. § 1308, *see* note 3, *supra.* Thus, clear authority compels our rejection of *Sunkist* and its interpretation of the Fire Statute that imposes an obligation of due diligence to make seaworthy on the shipowner and relieves the Cargo of its burden of proof on privity and fault causation. Both Congress [5] and the Supreme Court have made it clear that the Fire Statute is to be applied broadly, and the exception to the defense for fires "caused by the design or neglect of such owner" must be viewed narrowly. *E.g. Providence & New York S.S. Co. v. Hill Mfg. Co.*, 109 U.S. 578, 3 S.Ct. 379, 27 L.Ed. 1038 (1886). In that case the Court stated that if the Fire Statute "is administered with a tight and grudging hand, construing every clause most unfavorably against the shipowner, and allowing as little as possible to operate in his favor, the law will hardly be worth the trouble of its enactment." *Id.* at 589, 3 S.Ct. at 386. In its most recent pronouncement on the purpose of the Fire Statute,

the Supreme Court explained that Congress intended for shippers and not carriers to pay for insurance coverage of fire losses to cargo.

It enabled the carrier to compete by offering a carriage rate that paid for carriage only, without loading it for fire liability. The shipper was free to carry his own fire risk, but if he did not care to do so it was well known that those who made a business of risk-taking would issue him a separate contract of fire insurance. Congress had simply severed the insurance features from the carriage features of sea transport and left the shipper to buy each separately. While it does not often come to the surface of the record in admiralty proceedings, we are not unaware that in commercial practice the shipper who buys carriage from the shipowner usually buys fire protection from an insurance company, thus obtaining in *two* contracts what once might have been embodied in one. *The purpose of the statute to relieve carriage rates of the insurance burden would be largely defeated if we were to adopt an interpretation which would enable cargo claimants* *[256] and *their subrogees to shift to the ship the risk of which Congress relieved the owner.* This would restore the insurance burden at least in large part to the cost of carriage and hamper the competitive opportunity it was purposed to foster by putting our law on an equal basis with that of England.

*Consumer Import Company v. Kabushiki K.K. Zosenjo*, 320 U.S. 249, 255, 64 S.Ct. 15, 18, 88 L.Ed. 30 (1943) (emphasis added). In so stating, the Court affirmed the decision by Judge Learned Hand in which he declared: "We must not clutch at ... straws to find liability, or construe the Fire Statute grudgingly." 133 F.2d at 785.

---

**5.** Congress has devised a very detailed scheme for the burden of proof in maritime cargo cases, *see generally* Comment, *The Elements of the Burden of Proof Under the Carriage of Goods by Sea Act,* 12 Colum.J.Trans.L. 289 (1973), that deliberately achieves a "ping pong" sort of shifting of the burden. 46 U.S.C. § 1304(2). *Ni-*

*tram, Inc. v. Cretan Life,* 599 F.2d 1359, 1373 (5th Cir.1979).

As explained above, if the carrier satisfies his burden of showing loss by fire, the carrier will be exonerated if the cargo is unable to substantiate that it was caused by the "design or neglect" of the owner.

Against this legal background, we examine the District Court's findings.

### Design or Neglect of Such Owner

Accepting, *arguendo*, the trial court's finding that the cause of the fire was the covering of the manhole leading to No. 3 LTD with sacks of flour, and that such stowage was negligent in this case, we reject the Court's conclusion that such stowage was brought about by the "design or neglect" of the shipowner so as to overcome the fire defense.

The District Court reasoned as follows: The uncontroverted testimony established that the cargo layout section in Lykes' head office in New Orleans was responsible for confecting the stowage plan for Lykes voyages. The vessel was loaded pursuant to that plan. The stowage plan for Voyage 64 indicates that bags of flour were to be stowed "all over" in the No. 3 upper tween deck, blocking the manhole to the accessway ladder in the No. 3 lower tween deck. The Court finds that Lykes' management knew or should have known of this practice. *It is the carrier's responsibility to make sure the vessel is properly loaded. 46 U.S.C. § 1303(2).* The Court concludes that the stowage of the bags of flour over the manhole was attributable to the management level of Lykes. *Consumers Import Company v. Kabushiki Kaisha Kawasaki Zosenjo,* [320 U.S. 249] 64 S.Ct. 15 [88 L.Ed. 30] (1943). (Emphasis supplied).

Although we may accept the facts recited in this passage as supported by the record, we disagree with the Court's legal conclusions. It is plain that while asserting an alternative analysis on burden of proof, the Judge once again put primary reliance on the erroneous reasoning of *Sunkist* in his ruling on "design or neglect."

Although the District Court paid heed to the *Earle & Stoddart* holding on who bears the burden of proof, it ignored the Supreme Court's ruling in *Earle & Stoddart* on *what the cargo must prove.* The

italicized sentence in the foregoing quotation demonstrates that the District Court reasoned that the failure of the Carrier to "make sure the vessel is properly loaded ... [under] 46 U.S.C. § 1303(2)" leads to the conclusion "that the stowage ... was attributable to the management level of Lykes," and thus within Lykes' "design or neglect." If *Sunkist* were acceptable, this would be correct, because improper stowage constitutes unseaworthiness, and this would deprive the owner of the Fire Statute exemption under *Sunkist.* 603 F.2d at 1335–36.

However, the Supreme Court's opinion in *Earle & Stoddart* refutes *Sunkist* not only as to who bears the burden of proof, but also on what the cargo must prove to take the case out of the fire exemption. The cargo in *Earle & Stoddart* contended "that the [Fire] statute does not confer immunity where the fire resulted from unseaworthiness existing at the commencement of the voyage and ... discoverable by due diligence." 287 U.S. at 425–26, 53 S.Ct. at 200–01. The Court flatly rejected this position, declaring: "The courts have been careful not to thwart the purpose of the fire statute by interpreting as "neglect" of the owners the breach of what in other connections is held to be a non-delegable duty." 287 U.S. at 427, 53 S.Ct. at 201.

■ This admonition is directly applicable here. The District Court interpreted as "neglect" *of the owners* the improper stowage of cargo by lower-level employees, which in a non-fire COGSA context would be a non-delegable duty of the carrier properly to load, stow and care for the cargo. 46 U.S.C. § 1303(2); *Agrico Chemical Co. v. S.S. Atlantic Forest,* 620 F.2d 487, 489 (5th Cir.1980), *aff'g* 459 F.Supp. 638, 647 (E.D.La.1978). In a COGSA case involving a defense other than fire, the Carrier is liable for the negligence of its servants or agents in the loading, handling, stowing, carrying, caring for, or discharging the cargo. *Id.* The District Court cited (see the quotation *supra* ) *Consumers Import Company v. Kabushiki Kaisha Kawasaki Zosenjo,* 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed.

30 (1943), in support of like reasoning in the context of the Fire Statute.

Actually, *Consumers Import* is directly contrary to the District Court's reasoning. There the Supreme Court pointed out:

> The cause of the fire is found to be negligent stowage of the fish meal, which made the vessel unseaworthy. The negligence was that of a person employed to supervise loading to whom responsibility was properly delegated and who was qualified by experience to perform the work. No negligence or design of the owner or charterer is found.
>
> \* \* \* \* \* \*
>
> Since "neglect of the owner" means his personal negligence, or in case of a corporate owner, negligence of its managing officers and agents as distinguished from that of the master or subordinates, the findings below take the case out of the only exception provided by statute.

320 U.S. at 250, 252, 64 S.Ct. at 16, 17. This holding in *Consumers Import* is particularly compelling in this case for two reasons. First, it is the Supreme Court's most recent word on the Fire Statute. Second, the negligence was, as in this case, by shore-based persons who were delegated the task of designing and planning the stowage. Because the delegees were not managerial agents with a broad range of responsibility in the corporation and because they were "qualified by experience to perform the work," such negligence was not the "design or neglect" of the owner.

■ Other courts have reached the same conclusion with respect to the delegation of stowage decision in the context of the Fire Statute. *The Ocean Liberty*, 199 F.2d 134, 142–44 (4th Cir.1952); *American Tobacco Co. v. The Katingo Hadjipatera*, 194 F.2d 449, 450 (2d Cir.1951), *cert. denied*, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952). For similar holdings on fires resulting from non-stowage negligence by non-managerial agents, see *Albina Engine & Machine Works, Inc. v. Hershey Chocolate Corp.*, 295 F.2d 619 (9th Cir.1961); *Globe & Rutgers Fire Insurance Co. v. United States*, 105 F.2d 160 (2d Cir.1939); *The Older*, 65 F.2d 359 (2d Cir.1933). The effect of the Fire Statute on respondeat superior and delegation of duties has been summarized by a commentator in this field:

> In Chapter 7 dealing with due diligence, it was pointed out that a carrier cannot avoid its statutory obligation to exercise due diligence to make its vessel seaworthy by delegating that obligation to another. However, that principle is inapplicable in cases where damage to cargo by fire is within the exemption of the Fire Statute. If a vessel owner delegates to an independent agency of good repute the duty of laying out and supervising the stowage of a vessel or making her seaworthy; or if the owner in this regard relies upon the ship's officers or other qualified minor employees who are not the owner's managing representatives; and the negligence of those delegees is the proximate cause of subsequent fire loss of cargo, that negligence does not of itself defeat the owner's right to the exemption of the Fire Statute.

H. Longley, *Common Carriage of Cargo*, 172–73 (1967); 2A Benedict on Admiralty § 146 (7th Ed.1983). "The 'largeness of authority' of the carrier's representatives determines whether his 'neglect' or 'actual fault or privity' defeats the application of the statutory exemptions." *Id.* at § 145. Thus, it is clear that under the Fire Statute the negligence of corporate subordinates is not as the District Court assumed, "attributable" to the "managing officers and agents" either by respondeat superior or by the concept of non-delegable duties.[6]

■ In this case, the evidence showed only that the stowage plan called for the

---

**6.** Of course, there may be "design or neglect" if the owner negligently hired a person to perform a task for which he is incompetent. *E.g., Skibs A/S Jolund v. Black Diamond S.S. Corp.*, 250 F.2d 777 (2d Cir.1957); *United States v. Charbonnier*, 45 F.2d 174 (4th Cir.1930) (president of shipping corporation hired incompetent engineer even though not favorably impressed by interview). However, even in such cases, the negligence in hiring must be personal to a managing agent of the corporation.

manhole to be covered with sacks of flour and that the stowage plan had been prepared in the Lykes cargo layout department in New Orleans. As demonstrated above, the burden of proof was on the cargo to show that this stowage decision was within the "design or neglect" of the "managing officers and agents as distinguished from the master or subordinates" of Lykes. *See supra* p. 4172. Despite this burden, Cargo failed to present any evidence as to who within the layout department prepared this cargo plan and which, if any, supervisors checked and approved this person's work. There was no evidence of how many persons worked in this department, the various job categories and their corresponding spheres of authority, or the structure of the hierarchy leading from the layout personnel to the highest officers of the corporation. Nor was there any evidence that anyone with a broad range of authority in Lykes knew that cargo which might require access during the voyage was being stowed in No. 3 LTD and that the manhole

leading to that compartment was being covered by cargo.[7] Nor was there evidence of negligence in hiring an incompetent. Without such evidence showing a broad range of corporate authority in a person involved in the stowage decision, the District Court could not properly conclude that the improper stowage was within the personal "design or neglect" of the corporate owner. The evidence was only that some employee or employees in the layout department designed the stowage in this case. This is not sufficient to defeat the Carrier's defense under the Fire Statute. *See Consumers Import,* 320 U.S. at 250, 252, 64 S.Ct. at 16, 17. *Earle & Stoddard,* 287 U.S. at 425, 53 S.Ct. at 200 ("managing officers or agents;" chief engineer not included); *Hartford Accident & Indemnity Co. v. Gulf Refining Co.,* 230 F.2d 346, 355 (5th Cir.1956), *cert. denied,* 352 U.S. 832, 77 S.Ct. 49, 1 L.Ed.2d 52 (1956) ("unseaworthiness in itself does not constitute such neglect, and ... the negligence must be that of the owner himself or his manag-

**7.** Cargo raises a great hue about the stowage of cotton bales without open access during the voyage as being a violation of Coast Guard regulations. The regulations are somewhat unclear. Although access for inspection during the voyage is generally a requirement for stowage of "dangerous articles," *see* 46 C.F.R. § 146.02–12 (1975), a broad category including "hazardous articles," *see id.* at § 146.03–8, which in turn includes cotton, *see id.* at § 146.27–1(c), in § 146.27–100, special, detailed regulations have been promulgated for the stowage of cotton. 46 C.F.R. § 146.27–25. These extensive regulations particularly on cotton do not contain a requirement of access during the voyage. Because of the peculiar danger of fire, the regulations require a $CO_2$ or steam smothering system and also require that the hatch be closed and covered by tarpaulins to make a tight seal. *Id.* at § 146.27–25(b)(6)(c). These requirements were fulfilled in this case.

Perhaps because of this ambiguity, the District Court made no finding on any violation of Coast Guard regulations. However, we point out that if there had been a violation of safety regulations, this would not deprive the shipowner of its defense under the Fire Statute, unless Cargo proved that the shipowner or his managing agents were personally negligent in causing the violation that caused the fire damage. *Fidelity-Phenix Fire Ins. Co. v. Flota Mercante Del Estado,* 205 F.2d 886 (5th Cir.1953), *cert. denied,* 346 U.S. 915, 74 S.Ct. 275, 98 L.Ed. 411; *Automobile*

*Ins. Co. v. United Fruit Co.,* 224 F.2d 72 (2d Cir.1955); *Complaint of Caldas,* 350 F.Supp. 566 (E.D.Pa.1972), *aff'd* 485 F.2d 678 (3d Cir.1973).

Cargo also makes much of an isolated portion of the Master's testimony in which he stated that the covering at times of access manholes was not uncommon throughout the shipping industry. The Master explained that access during the voyage is not needed for certain cargos, and that leaving an access passage in a stow of cargo above a manhole might create an unnecessary hazard of instability in the cargo. Cargo argues that this testimony shows that the covering of manholes with cargo was so widespread as to be known by all, including the Lykes managers. The District Court did not make any finding that the Lykes management knew that access to cargo requiring inspection during the voyage was routinely being blocked on Lykes ships. To the contrary, the District Court found that the particular stowage decision in this case was made in the cargo layout department, and thus the particular decision was "attributable" to management. Indeed, the Master's testimony was so general as to state only the equivalent of what is in the Coast Guard regulations: that access is required for certain types of cargo, but not for others. *See* 46 C.F.R. § 146.02–12(a) (1975). There is absolutely no evidence that Lykes management knew or should have known of a general practice among its subordinates of blocking access to stows of *cotton,* or to any other cargos to which open access is required.

ing officers"); *Complaint of Caldas,* 350 F.Supp. 566, 573 (E.D.Pa.1972), *aff'd* 485 F.2d 680 (3d Cir.1973) ("only if the negligence can be personally attributed to the owner or to *agents with broad responsibility* in the corporate organization ..." (emphasis added)). Thus, the District Court erred in holding the Carrier liable for the ignition of the fire.

### Causation: A Long Chain

Our reversal does not depend alone on the "design or neglect" analysis above. Even if it were assumed—as held by the District Court—that the stowage of sacks of flour blocking the manhole access to No. 3 LTD were somehow attributable to the management of Lykes,[8] there is still no proof that the fire was *caused* by the design or neglect of the shipowner. The District Court's theory fails because of gaps in the evidence needed to support the long chain of supposed causation.

We start with the physical fact that the fire was not—in the ordinary operational sense—*caused* by the blocked manhole. A fire requires ignition. No ignition sprung from the manhole or from the sacks covering it. However, we are not so naive as to conclude that the mere physical and logical distance from the manhole above to the fire in the cotton bales below automatically exonerates the shipowner. We have to recognize, as did the Second Circuit, that there may be liability under the Fire Statute "where the shipowner's negligence did not cause ignition of the fire but where damage to the cargo could have been prevented ... had it not been for the negligence of the shipowner." *Asbestos Corp. v. Compagnie De Navigation,* 480 F.2d 669, 672 (2d Cir.1973).

Because there was no direct evidence available, the District Court reached its finding of how the fire started "through a combination of common sense, circumstantial evidence and expert testimony":

the fire started when the turnbuckle, on the chain securing the pipe stow, snapped, causing a spark, which ignited the cotton. In view of the fact that a clanking noise was heard in No. 3 lower tween deck about twelve hours prior to the first observation of smoke, the heavy seas that continued after the clanking noise was heard, and the flammable nature of the cotton stowed adjacent to the pipes, the Court finds no other reasonable explanation as to how the fire started.

At oral argument, counsel for Carrier stated that he could live with this finding on the physical cause of ignition, and we also assume the correctness of this explanation for the ignition. However, Carrier contends that there was no causal connection between the blocking of the manhole and the breaking of the turnbuckle. The District Court undertook to find this connection in this manner:

Had the accessways not been blocked, the fire would not have occurred, because the crew members who had checked the cargo in other holds where the manhole accessway was not blocked, would have had the opportunity to investigate the clanking noise heard the night of August 31st. Instead, there was no access to the No. 3 lower tween deck, and as a result, it was impossible to correct the situation. The Court finds, therefore, that the fire was caused by the "neglect or design" and "fault or privity" of Lykes.

The foregoing reasoning, based as it is on unproved assumptions that are not supported by the evidence, but only by speculation is flawed. This theory of causation adopted by the District Court assumes that (1) the chain was loose before the turnbuckle broke so that tightening of the turnbuckle would have prevented its breaking, (2) if the manhole had not been covered, a crewman could and would have been able to

---

**8.** In this section of the opinion we assume *arguendo* Cargo's theory that since the covering of manholes was a common practice, it was necessarily known to all and hence to the management level of Lykes, and, as the District Court found "that it was negligence on the part of the carrier in doing so."

descend into the No. 3 LTD during the voyage and find the turnbuckle in a position in which he could tighten it and (3) that the turnbuckle broke because the chain was too loose and put under excessive stress, and not because of some metallurgical deficiency unknown or unknowable to the shipowner.

The covering of the manhole is not a cause, because even if the access into No. 3 LTD had been open, there was no evidence that a crewman could have tightened the particular turnbuckle that broke. To the contrary, uncontroverted evidence showed that the turnbuckle before it broke had been tightly "sandwiched" or "imbedded" between the ends of two bales of cotton at the bottom of the stow. The report of Dr. Foster, who was employed by Cargo and who was the only expert who examined No. 3 LTD after the fire, stated that the turnbuckle had been "sandwiched" between two cotton bales. At oral argument, counsel for Cargo, in arguing the turnbuckle-spark theory of causation, described the turnbuckle as "imbedded" between the two bales, which logically supports the theory that a spark from the turnbuckle was still hot enough to cause ignition when it reached the cotton. With the turnbuckle in such a tight spot, there was absolutely no evidence that there was sufficient space in which a crewman could have inserted a lever into the turnbuckle and rotated it through an arc. Nor is there any evidence that with the turnbuckle imbedded as it was, heavy chains such as those pictured in the photographic exhibits could be tightened by hand to a sufficient tension without a lever. Thus, access into No. 3 LTD could not have led to the retightening of the chain in question. "The defendant's conduct is not a cause of the event, if the event would have occurred without it." W. Prosser, Law of Torts § 41 (4th ed. 1971). Accord, *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 12 (5th Cir.1976); *American Tobacco Co. v. The Katingo Hadjipatera*, 194 F.2d 449, 451 (2d Cir.1951). *See Harrison v. Prather*, 435 F.2d 1168 (5th Cir.1970). Under the turnbuckle-spark theory of ignition, the fire would have resulted even if the manhole had not been blocked. Thus, the stowing of flour over the manhole was neither a legal cause nor cause in fact of the fire.

In addition, there was no evidence that the chain was actually loose before the turnbuckle broke. If not, then the fire would have occurred even if there were access into No. 3, because the breaking of the turnbuckle could not have been prevented by tightening the buckle. The first and only indication that any chain was loose was the clanking noise heard by the crew at 23:25 hours on August 31. There is no evidence indicating whether the turnbuckle broke at that time and gave off the igniting spark at that time. The smoke detector was triggered 12 hours later, when the spark had built up to a combustion large enough to produce visible amounts of smoke rising out of the weather deck several decks above. As all expert testimony and the events in this case show, cotton can smolder in a quiescent state indefinitely without triggering even sensitive smoke detectors. If the turnbuckle broke when the clanking sound was first heard, then there is no evidence, circumstantial or otherwise, that the chain was ever loose before the turnbuckle broke. Because there was no evidence showing when during this 12 hour period the turnbuckle broke and the spark was produced, it is unknown whether the buckle broke from a metallurgic defect[9] while the chain was tight, or whether the chain had been loose and clanking for 12 hours when the buckle broke and immediately caused detectable smoke. The failure of Cargo—who had the burden of proof on causation from design and neglect—to produce evidence that the chain was loose before any clanking cargo movement was heard, and

---

**9.** According to the report of Dr. Foster, a metallurgic test would reveal whether the break was due to a metallurgic defect. But no such metallurgic test was ever made or evidence offered.

If there were a metallurgic defect, there was no evidence whatsoever that this was due to owner's design or neglect.

the failure to produce evidence that the buckle did not break from a metallurgic defect when the chain was tight leaves a gap in the chain of causation that can be bridged only by speculation.

The theory that the turnbuckle broke because the pipes were moving within a chain that had become too loose is overcome by the fact that the stow of pipes did *not* break loose. Photographs and other evidence show that two of the three heavy chains and turnbuckles on the stow of narrow pipes held them in a bundle against the bulkhead despite extended heavy weather and a raging fire. The lashing was adequate to hold the stow without regard to the covering of the manhole. Because the bundle remained intact and the other two chains did not break, it is simply speculation that the turnbuckle on one chain, but not those on the other chains, broke from excessive force resulting from the pipes moving within a loose chain. Again, if the turnbuckle did not break because of the looseness of the chain, then access through the manhole would not have prevented the fire.

Generally, courts asked to accept expert speculation on the cause of a fire aboard ship based on sketchy circumstantial evidence have resisted the temptation. Instead, these courts held that the cause of the fire was simply not proved. Because the Fire Statute placed on the cargo a burden that was impossible to carry, there was no recovery. *Fidelity-Phenix Fire Ins. Co. v. Flota Mercante Del Estado*, 205 F.2d 886 (5th Cir.1953); *Rooney v. Nuta*, 267 F.2d 142 (5th Cir.1959) (clear error in speculative finding of cause of vessel fire in non-cargo limitation of liability proceeding); *American Tobacco Co. v. The Katingo Hadjipatera*, 194 F.2d 449, 451 (2d Cir. 1951) (reversing conjectural finding of cause of fire "based not on facts on which a witness testified orally, but only on secondary or derivative inference from the fact which the judge directly inferred from such testimony."); *Hoskyn & Co. v. Silver Line*, 143 F.2d 462 (2d Cir.1944); *Automobile Ins. Co. v. United Fruit Co.*, 224 F.2d 72 (2d Cir.1955); *Complaint of Caldas*, 350 F.Supp. 566 (E.D.Pa.1972) *aff'd*, 485 F.2d 678 (3d Cir.1973); *The Strathdon*, 101 F. 600 (2d Cir.1900); *Connell Bros. Co. v. Sevenseas Trading & S.S. Co.*, 111 F.Supp. 227 (N.D.Cal.1953), *rev'd on other grounds* 220 F.2d 511 (9th Cir.1955); *Rockwood & Co. v. American President Lines, Ltd.*, 68 F.Supp. 224 (D.N.J.1946); *The Munaires*, 12 F.Supp. 913 (E.D.La.1935); *The President Wilson*, 5 F.Supp. 684 (C.D.Cal.1933); *The Cabo Hatteras*, 5 F.Supp. 725 (S.D.N.Y.1933); *The Brenta II*, 5 F.Supp. 682 (E.D.N.Y.1933); *Petition of Sinclair Navigation Co.*, 27 F.2d 606 (S.D.N.Y.1928). Because the tenuous connection between the covered manhole and the fire is so dependent on speculation and unproved facts, we join these many courts in holding that the asserted *cause* of the fire was not proved to have been from the owner's design or neglect.

The District Court also held that the stowage of cargo over the manhole was a cause of the cutting of the hole in the bulkhead between No. 3 and No. 4 through which to fight the fire. The District Court reasoned:

The negligent blocking of the access manhole was clearly a proximate cause of not only the fire, but the ensuing damage as well. The blocking of the accessway was the cause of the cutting of the access hold in the bulkhead.

The cutting of the access hole in the bulkhead obviously contributed to the salt water flooding of the No. 4 hold. The Court does not feel, however, that the blocking of the accessway was any less a cause of the damage to cargo in the No. 4 hold because of the natural consequence of events which followed the start of the fire.

The Court feels that the efforts to extinguish the fire, particularly the cutting of the access hold, were the natural consequences of Lykes' negligent blocking of the accessway.

Our holding that the covering of the manhole did not result from the design or neglect of the shipowner disposes of the Dis-

trict Court's holdings both as to the shipowner's responsibility for the ignition of the fire, and as to responsibility for creating a need to cut a hole in the bulkhead separating No. 3 LTD and No. 4 in order to fight the fire.

### The Firefighting Effort: Quenching the Claim

This brings us to the purported cross-appeal by Cargo from the District Court's finding that, whether or not the firefighting effort was negligent, it was not attributable to the shipowner, because the Master retained control of the decision-making in the foreign port. We describe this as "purported" since Cargo was the victor below. Cargo did not need an additional basis for a decree of liability against the Carrier. Cargo's prescience in foreseeing our reversal as to liability for the covering of the manhole has turned the purported into a reality. The cross-appeal was appropriate and we must address it. Having done so, we affirm.

█ A Carrier may be liable for fire damage where the "design or neglect" of the owner prevented extinguishment of the fire once it had begun. *E.g., Complaint of Ta Chi Navigation (Panama) Corp.*, 677 F.2d 225, 228 (2d Cir.1982). Carrier liability on this basis has generally been predicated on failure to provide adequate firefighting equipment and training, or a failure by management level employees to use a clear opportunity and available means to put out the fire. *See Asbestos Corp. v. Compagnie De Navigation*, 480 F.2d 669 (2d Cir.1973); *American Mail Line, Ltd. v. Tokyo Marine & Fire Ins. Co.*, 270 F.2d 499, 501 (9th Cir.1959); *Fidelity-Phenix Fire Ins. Co. v. Flota Mercante Del Estado*, 205 F.2d 866, 889 (5th Cir.1953); *Great*

*Atlantic & Pacific Tea Co. v. Brasileiro*, 159 F.2d 661, 664 (2d Cir.1947).

In this case, there is no contention that the LESLIE did not have a complete, properly working system of firefighting equipment or that it was not used. Cargo challenged the specific tactics used to extinguish the fire after the vessel was moored in a foreign port. The District Court found that the Master, although listening to advice from Spanish port authorities, the Spanish naval firefighting school officials and shore-based Lykes employees, retained and exercised actual ultimate control over the firefighting effort on his ship. The tactical decisions of the Master, the Court held, were not attributable to the owner. Thus, the District Court did not reach the issue of whether the elaborate firefighting effort was negligent.[10]

Cargo argues that the District Court erred, because the Carrier was under a duty to either *take* control to the extent possible or else be responsible for any negligent decision made by the Master.

█ A master is empowered to exercise his good faith judgment until he is relieved of his command, especially where the safety of his crew, vessel, and cargo are concerned. *See United Geophysical Co. v. Vela*, 231 F.2d 816, 819 (5th Cir.1956). We point out that a master is answerable not only to the shipowner for his job, but is also answerable to the Coast Guard, who giveth and taketh away pilot licenses.

One thing heavily stressed in Cargo's attack on the manner of the firefighting as negligent is the Master's decision to cut the hole in the No. 4 bulkhead. Cargo contended at trial that the Master was negligent in not uncovering the manhole cover to No. 3 LTD once the vessel was in port and fighting the fire through the manhole. For

---

**10.** The District Court explained:

The Court does not feel that suggestions made by Mr. Bernstein nor active assistance on the part of Mr. Castro constitute control such as to attribute the firefighting endeavors to Lykes' management. The Court finds, therefore, that the actions taken in an effort to extinguish the fire were taken pursuant to the orders of Captain Metcalf.

Hence, the Court does not reach the contention of cargo that the carrier was negligent in actually fighting the fire because the Court had concluded that Captain Metcalf made the decisions relating to the method of fighting the fire, which decisions are not attributable to the carrier. *Great Atlantic and Pacific Tea Co. v. Brasileiro*, 159 F.2d 661 (2d Cir.1947).

three reasons the Master chose to cut the hole in the No. 4 bulkhead, rather than attack the fire from above. First, pertinent firefighting literature admitted into evidence advised fighting a cargo fire from its own level, rather than from above. Second, the Master considered it too dangerous to send a man down the manhole ladder into the smoldering LTD. Third, the Master believed that the necessary oxygen breathing apparatus would not fit through the narrow manhole. The Master's decision was made in light of these factors. The decision did not relate to whether the manhole was open or covered. If the Master's decision were negligent, such negligence would not be attributable to the owner under the Fire Statute nor under the District Court's finding, which we affirm.

The owner is not liable for a master's negligence in fighting fires, unless the supervision exercised by the owner is also negligent. *E.g., Great Atlantic & Pacific Tea Co. v. Brasileiro,* 159 F.2d 661, 664 (2d Cir.1947). *Cf., Craig v. Continental Insurance Co.,* 141 U.S. 638, 639, 12 S.Ct. 97, 98, 35 L.Ed. 886 (1891) (acts of owner's envoy, who took command of vessel, were not within "privity or knowledge" of owner). Thus, in this case, where the Master retained decision-making authority, and was operating in a foreign port and needing to accommodate the concerns of foreign port officials and yet act expeditiously, the question of the owner's liability for the firefighting effort narrows to whether the owner was negligent in not insisting that the Master take a different course of action and relieving him of his command if he refused. The District Court's finding that the Master's actions were not attributable to the owner states in different words that management level employees did not know of any obviously unwise course of action taken by the Master that would require the owner to rigidly overrule the Master's "good faith latitude in professional judgment" by relieving him of his command. *Vela,* 231 F.2d at 819. The evidence was to the contrary. The Master safely brought the vessel with the cargo fire through heavy weather in the North Atlantic and into a safe harbor. The crew was saved, as was the vessel, and most of the cargo. After the fire, the voyage was completed. Thus, we find no error in the District Court's findings that, even if some aspect of the firefighting were negligent, such negligence would not be attributable to the owner.

In summary, we hold that the Carrier is exonerated from liability for the fire and water damage in this case by the Fire Statute. The interlocutory judgment is reversed, the cross-appeal is affirmed, and the case remanded for further proceedings.

REVERSED IN PART, AFFIRMED IN PART.